## HALTON WILSON MOORE *v.* STATE OF MARYLAND

[No. 299, September Term, 1971.]

*Decided December 21, 1971.*

---

1. *Meyerson v. State,* 181 Md. 105, relied upon by the appellant, is not apposite to the facts of this case.

712

The cause was argued before MURPHY, C. J., and ORTH and GILBERT, JJ.

*Gerald A. Zimlin,* with whom was *Robert L. West-heimer* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Jerry H. Hyatt, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

HALTON WILSON MOORE, convicted at a bench trial in the Criminal Court of Baltimore of violation of the narcotic laws, gives two reasons why the judgments entered should be reversed. First he claims that the lower court erred in denying his motion to suppress certain tangible evidence and second he contends that even if the challenged articles were properly admitted the evidence was not sufficient to sustain the convictions.

## THE SEARCH WARRANT

The evidence sought to be suppressed was alleged to have been obtained in violation of the 4th Amendment proscription against unreasonable searches and seizures. The search and seizure were under the authority of a warrant valid on its face. But Moore contends it was illegal because the affidavit on which it was issued did not show probable cause.

The rules governing probable cause for the issuance of a search and seizure warrant need not be complex, intricate or perplexing.[1] We said in *Buckner v. State,* 11

---

1. This is difficult to appreciate, however, from opinions of the Supreme Court. For example, in *Spinelli v. United States,* 393 U. S. 410, involving an informer's tip, the Court believed it desirable that principles with respect to probable cause enunciated in *Aguilar v. Texas,* 378 U. S. 108, should be further explicated. At 412. It explicated them as follows, at 415-416:

> "The informer's report must first be measured against *Aguilar's* standards so that its probative value can be assessed. If the tip is found inadequate under *Aguilar,* the other allegations which corroborate the information contained in the hearsay report should then be consid-

714

Md. App. 55, 61-62:

"A judge may issue a search warrant when it is made to appear to him by a written application signed and sworn to by the applicant, accompanied by an affidavit containing facts within the personal knowledge of the affiant, that there is probable cause to believe that a crime is being committed by any individual or in a building within his territorial jurisdiction, and that evidence of the crime is upon the person or within the place to be searched. * * * Probable cause is less than certainty or demonstration but more than suspicion or possibility. It is to be determined by the judge to whom application for the warrant is made. If a prudent and cautious man would be justified from the facts presented in the affidavit in believing that the offense has been or is being committed, the warrant properly may be issued. In determining the existence *vel non* of probable cause, the judge may give consideration to the special significance which objects, happenings, and individuals may have conveyed to a trained, experienced and knowledgeable police officer making the affidavit accompanying the warrant. * * *

ered. At this stage as well, however, the standards enunciated in *Aguilar* must inform the magistrate's decision. He must ask: Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration? *Aguilar* is relevant at this stage of the inquiry as well because the tests it establishes were designed to implement the long-standing principle that probable cause must be determined by a 'neutral and detached magistrate,' and not by 'the officer engaged in the often competitive enterprise of ferreting out crime.' Johnson v. United States, 333 U. S. 10, 14, 68 S. Ct. 367, 369, 92 L. Ed. 436 (1948). A magistrate cannot be said to have properly discharged his constitutional duty if he relies on an informer's tip which — even when partially corroborated — is not as reliable as one which passes *Aguilar's* requirements when standing alone."

This, if so expressed by a less august body, might be deemed gobbledygook.

And the affidavit may be based on hearsay information, even from an unidentified informant, and need not reflect the direct personal observations of the affiant, but it must contain some of the underlying circumstances from which the affiant could be reasonably justified in a belief that the hearsay information was reliable or the informant was credible. * * *

"When a search warrant is challenged, the lower court, and the appellate court when the determination of the lower court is before it on appeal, must look for probable cause only in the affidavit itself and may not go outside it. * * * However the affidavit should be interpreted in a common-sense and not in a hypertechnical manner, and the resolution of doubtful or marginal cases should be largely determined by the preference to be accorded to warrants. * * * But * * * this is not to say that probable cause can be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists." (citations omitted)

Thus probable cause may be shown in the affidavit by a statement by the affiant 1) of his direct observations, or 2) of information furnished the affiant by someone else, named or unnamed, or 3) of a combination of the direct observations of the affiant and hearsay information furnished him. In each instance the issuing judge must have before him enough circumstances to enable him to determine the trustworthiness of the information, for he must not only evaluate the adequacy to show probable cause of the facts and circumstances set out in the affidavit but he must also evaluate the truthfulness of the source of the information comprising those facts and circumstances.[2] Due to the infinite variety of human conduct,

---

2. A problem arises with respect to the truthfulness evaluation only when hearsay information is involved. As to the direct ob-

the sufficiency of any affidavit must necessarily depend upon the particular facts and circumstances in it contained.

The warrant before us, issued 24 November 1970, commanded the search of the premises 1145 S. Sharp Street and the person of Halton Moore, Sr.,[3] affidavit having been made by Officer John W. Nock that he had reasons to believe that there was certain described property concealed on the premises and on Moore's person in violation of the narcotics laws and the issuing judge being satisfied that there was probable cause to so believe. The facts and circumstances set out in the affidavit incorporated in the application for the warrant consisted of a combination of direct observations of the affiant Nock and hearsay information furnished him by unnamed informants. It alleged that the premises 1145 Sharp Street were "being used, kept, rented, owned, or occupied" by Moore and a person known as "alias 'Country John', colored male, 40 years, 5' 11", 190 lbs, dark complexion." It stated that Nock had 13 years experience with the Baltimore City Police Department, had "completed a two weeks course on Narcotics and Dangerous Drugs", and had "made approximately 150 arrests over the past year for violation of the narcotics laws." Nock asserted that he had received information from reliable informants who had given him information in the past which resulted in arrests and convictions for violations of the narcotic laws. The information was that Country John had sold to them quantities of Dilaudid "at different locations on the street over a period of weeks." They knew the drug to be in fact Dilaudid "because in administering the drug, they experienced the same state of euphoria they had in the past when using what they knew to be Dilaudid." On

servations of an affiant the "oath, as a trustworthiness device, establishes, *per se*, the credibility of the affiant-source, and thereby, the reliability of his directly observed information." *Dawson v. State*, 11 Md. App. 694, 699.

3. We are not concerned with the validity *vel non* of the command to search Moore. None of the challenged evidence was found on his person.

23 November 1970 Nock received further information from a confidential informant who had given him information in the past which he knew to be "true and accurate in reference to Drug traffic in the South Baltimore area," and who had "shown a knowledge of Drug users and distributors in the South Baltimore area" and was in fact an addict. This informant said he had purchased Dilaudid from Country John and "Halton Moore" on a regular basis over the past week. The sales were conducted "inside the residence of 1145 Sharp Street which is the residence of Halton Moore and that 'Country John' and Halton Moore appear to be conspirators in these sales." On the information received Nock gave the informant $6 in marked money. "[W]e went by personal vehicle to the area of West and Leadenhall Streets at which time the informant proceeded on foot to the rear of 1145 Leadenhall Street. I, your affiant observed as the informant knocked at the rear door and same was opened by a subject before described and known by me as 'Country John'. The informant spoke to 'Country John' and handed him the U.S. Currency which had been furnished by your affiant. 'Country John' in turn reached into his right pants pocket and removed what appeared to be several glacine bags containing white powder and removed one glacine bag which he handed to the informant. * * * Prior to and after the controlled informant buy, the informant was strip searched and found to be free of any narcotics or U.S. Currency in both instances." [4] A field test of the powder in the bag sold to the informant showed that it was an opium derivative.

Moore questions the trustworthiness of the informants' information and the adequacy of the facts and circumstances to show probable cause.

Our first inquiry is whether the affidavit contained such underlying circumstances as would properly persuade the

---

4. Patently the search prior to the buy was before Nock gave the money to the informant and the search subsequent to the buy was after the informant gave Nock the glassine envelope.

issuing judge that the informants were credible or the information they gave was reliable. Of course this can never be established solely by reason of the fact that the information proved accurate when acted upon. *Bolesta v. State,* 9 Md. App. 408. The only underlying circumstances given with respect to the first set of informants, characterized as "reliable" by Nock,[5] were that "[o]ver the past" they had given him "information in the past which resulted in arrests and convictions for violations of the narcotic laws." The underlying circumstances as to the second informant were that he "had given information in the past" which Nock knew "to be true and accurate in reference to Drug Traffic in the South Baltimore area", that he had "also shown a knowledge of Drug users and distributors in the South Baltimore area", and that he was "in fact a user of prohibited substances himself." We do not believe that these circumstances, considered alone, were sufficient in the light of their lack of specificity. As to the first informants it was not shown how many informants gave the prior information, or when. "Over the past" and "in the past" could be the distant past or the immediate past or sometime in between. It does not follow that because an informant gave a tip years or even months ago which proved reliable, that he is forever after credible. Nor do we think it enough that this information given at some undetermined time resulted in arrests and convictions for violation of the narcotics laws. We do not say that such facts must be so detailed as would compromise the identity of the informant but we think more specificity than here presented is required, at the least as to about when past information was received and about how many arrests and how many convictions resulted therefrom. With regard to

5. "The magistrate may no more accept an affiant's assertion that his source (named or unnamed) is credible in lieu of a recitation of facts from which the magistrate may draw that conclusion for himself than he may accept an affiant's assertion that affiant himself is credible as a substitute for the affiant's taking of the oath." *Dawson v. State, supra,* at 700. Compare *United States v. Harris,* 403 U. S. 573, 91 S. Ct. 2075.

the second informant there is again a lack of specificity. Not even the general nature of the information given in the past which Nock knew to be true and accurate in reference to drug traffic in the South Baltimore area or the type of knowledge the informant showed as to drug users and distributors in that area are given. It may well have been such information as would be a matter of common knowledge. Nor did Nock state that he knew of his personal knowledge that this informant was in fact a user of drugs or whether this was also hearsay. We feel that the underlying circumstances here as to the informants' credibility was only a small step removed from the unsupported and conclusionary assertion that an informant has "furnished information which has proven to be reliable in the past" which we found insufficient in *Iannone v. State,* 10 Md. App. 81, 85. We think there must be more. We do not think that *United States v. Harris, supra,* bridges the gap, for the affidavit here does not reflect any personal knowledge of the suspect's background, although each informant may have made a declaration against his criminal interest. *Holland v. State,* 13 Md. App. 635.

Because there were not sufficient circumstances stated to establish that the informants were inherently credible by proved past performance or testimonials as to character or otherwise, our inquiry does not end. We next look to circumstances appearing in the affidavit showing that the information given was otherwise reliable by virtue of having been furnished under circumstances reasonably insuring trustworthiness. But no such circumstances are set out in the affidavit before us. However, even though the affidavit was not adequate to establish the informants' credibility or the reliability of their information by virtue of the circumstances under which it was furnished, the informants' information is not valueless. "Rather it need[s] some further support." *Spinelli,* at 418. Such support may be found in the affiant's personal observations and we find it in Nock's observations as recounted by him in his affidavit. Nock personally saw

Country John sell Dilaudid to the second informant. We think that this direct observation by Nock extrinsically established the necessary trustworthiness of the information given by both the first set of informants and the second informant. We are aware that this transaction between the informant and Country John occurred, according to the affidavit, at 1145 Leadenhall Street rather than 1145 Sharp Street.[6] That the transaction did not take place at 1145 Sharp Street does not destroy the "further support." The significant fact is that the transaction was with Country John, directly verifying the informants' tips that he was selling drugs. "If some of the significant details of the informant's story are shown to be, in fact, true, that encourages the magistrate to believe that all of the story is probably true." *Dawson v. State, supra,* at 704. We find that the "credibility-reliability" prong of the two prong *Aguilar* test was met.

There is no difficulty with the second prong of the *Aguilar* test—that the informants' conclusion was validly arrived at. The first set of informants said that they had purchased drugs from Country John. The second informant said that he had purchased drugs from Country John and Moore on a regular basis during the preceding week at 1145 Sharp Street. No conclusion by the informants that Country John and Moore were violating the narcotics laws was required; the informants were directly involved in the commission of the offenses.

We find that the facts and circumstances in the affidavit were sufficient to establish the trustworthiness of the informants' information. Having so found the question is whether the affidavit showed that probably the narcotics laws were being violated at 1145 Sharp Street. We think it clear that the affidavit contained adequate probable cause to believe that the narcotics laws were

---

6. The lower court thought the difference in the address was "a careless error by the officer in dictating" the affidavit. The affidavit must be accepted as it reads. *Scarborough v. State,* 3 Md. App. 208. We consider that the sale was made at 1145 Leadenhall Street.

being violated in 1145 Sharp Street. Since the hearsay information in the affidavit here was trustworthy, and since hearsay information is sufficient in itself to establish probable cause, *Ward v. State,* 9 Md. App. 583, *Sessoms v. State,* 3 Md. App. 293, we need look only to it. It was that prohibited drugs were being sold in the premises 1145 Sharp Street. This was enough properly to satisfy the issuing judge that there was probable cause to believe that drugs, and related contraband were being concealed on those premises. We find that the warrant was valid. Thus the search and seizure made under its authority on 27 November 1970 were reasonable. We hold that the lower court did not err in denying the motion to suppress the evidence.

### THE SUFFICIENCY OF THE EVIDENCE

The specific offenses of which Moore was convicted, each alleged to have been committed on 27 November 1970, were:

Indictment 503:

> 1st count—possession with intent to manufacture and distribute of the narcotic drug Dilaudid, Code, Art. 27, § 286 (a) (1);
> 2nd count—possession of Dilaudid, § 287 (a);
> 3rd count—possession of controlled paraphernalia, § 287 (b).

Indictment 504:

> keeping a common nuisance, to wit, a dwelling at 1145 South Sharp Street "then and there resorted to by drug abusers for purposes of illegally administering Controlled Dangerous Substances and was used for the illegal Manufacture, Distributing, Storage and Concealment of" the narcotic drugs heroin and dilaudid, § 286 (a) (5).

He was sentenced to 4 years on each conviction under indictment 503, the sentences to run concurrently and

to 4 years on the conviction under indictment 504 to run consecutively with the sentences under 503.[7]

Nock testified on the general issue that he executed the warrant on 27 November 1970. Entering the premises 1145 S. Sharp Street he started to go to the third floor because as he approached the premises he saw lights on that floor. When he reached the second floor he saw Wagner, whom he knew as Country John, on the third floor, "standing at a window in the bedroom, small bedroom, with his right arm protruding through the glass of the window." Moore was in the same room. Two improvised hypodermic syringes with needles attached were "in plain view on the bed" in the room.[8] Also on the bed were a standard hypodermic syringe with needle attached, eight five-eighths of an inch disposable sterile needles and a bottle cap with a burnt bottom and wire wrapped around it. In a fuse box in the kitchen he found an empty glassine bag. Nock, who testified that he had worked in narcotics for over two years, had attended a two week course in narcotics conducted by the Federal Bureau of Narcotics and a three day seminar in Baltimore, and had made some 350 arrests for violation of the narcotics laws, said that the paraphernalia was adapted for the injection of drugs. The glassine bag was such as was used to contain narcotics. The bottle cap,

---

7. By addendum to each of the indictments Moore was warned that the State intended to prosecute him for the current offense as a subsequent offender. It seems that the State did not pursue prosecution of the addenda. Moore was tried jointly with John Wagner, Jr., who was charged with violation of the narcotics laws under indictment 502. That indictment does not appear in the record before us but the transcript of the proceedings shows that he was convicted under each of the 1st, 2nd and 3rd counts thereof and sentenced to 4 years on each conviction, the sentences to run concurrently. The transcript further reflects that Moore was charged in indictment 505 with possession of heroin. Motion for judgment of acquittal as to that indictment was granted at the close of evidence offered by the State.

8. Nock described an improvised hypodermic syringe: "This particular type of needle is an improvised needle, having the rubber suction cap attached to the one end, and a standard hypodermic needle attached to the other, with a piece of plastic tubing in the center, which is used as the container for the drug that is drawn into the suction cup."

held by the wire, was commonly used as "a cooker to mix up heroin and methadone or dilaudid, what have you, with water, and its cooked and then the container is used to drain it off into the hypodermic syringe." When Nock looked out the window through which Country John had stuck his arm, he saw beneath the window a package on the roof of the second floor of the adjoining property. The package was recovered. In it were 26 glassine envelopes containing a white powder. Chemical analysis established that the powder was "Dilaudid (an opium derivative narcotic) a Schedule II controlled dangerous substance." [9]

There was evidence adduced that Moore occupied the premises. Two envelopes were found in a second floor bedroom. One, postmarked 7 April 1970 from a firm of attorneys, was addressed to "Mr. Halton Moore, 1145 S. Sharp Street, Baltimore, Maryland 21230." The other, from the District Director of Internal Revenue Service, Baltimore, Md. was addressed to Mr. & Mrs. Halton Moore at the Sharp Street address.[10] Country John Wagner, testifying in his own behalf, said that 1145 South Sharp Street was the home of Moore. Wagner said he went there two or three times a week "to see Mr. Moore" whom he had known for 20 some years. That it was Moore's "home" was not refuted; Moore did not testify. Wagner further testified that he had been a drug addict for 15 years and had injected drugs in 1145 Sharp Street that evening before the raid.

With regard to the sufficiency of this evidence we note the following statutory definitions which were in effect on 27 November 1970.[11] " 'Possession' shall mean the exercise of actual or constructive dominion or control

9. Nock also recovered a revolver "laying on the side of the [third floor] room" and six cartridges in Country John's pocket.

10. A form entitled "Certificate, Medical Assistance Program, State of Maryland" bearing the name of Halton Wilson Moore and the notation that it began the first day of June 1970 and expired the last day of November 1970 was also found on the premises. It gave Moore's address as 1023 Poach Street, Baltimore, Md.

11. But see chapters 273 and 493, Acts 1971, effective 1 July 1971.

over a thing by one or more persons." Code, Art. 27, § 277 (s). " 'Distribute' shall mean to deliver a controlled dangerous substance." § 277 (1). " 'Manufacture' shall mean the importation, production, preparation, propagation, compounding, or processing of a controlled dangerous substance, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis." § 277 (p). A common nuisance "shall mean any dwelling house * * * which is resorted to by drug abusers for purposes of illegally administering controlled dangerous substances or which is used for the illegal manufacture, distribution, dispensing, storage or concealment of controlled dangerous substances or controlled paraphernalia * * *." § 286 (a) (5). Controlled paraphernalia "shall mean (i) a hypodermic syringe, needle or other instrument or implement or combination thereof adapted for the administration of controlled dangerous substances by hypodermic injections under circumstances which reasonably indicate an intention to use such controlled paraphernalia for purposes of illegally administering any controlled dangerous substance. (ii) Gelatine capsules, glassine envelopes or any other container suitable for the packaging of individual quantities of controlled dangerous substances in sufficient quantity to and under circumstances which reasonably indicate an intention to use any such item for the illegal manufacture, distribution or dispensing of any such controlled dangerous substance." § 287 (d).

The evidence before the lower court, considered in the light of these definitions, was sufficient in law to show that Moore possessed the controlled dangerous substance Dilaudid, that he possessed controlled paraphernalia, that his possession of Dilaudid was with intent to distribute, and that he kept a house resorted to by drug abusers for administering Dilaudid and used to distribute, dispense, store and conceal both that controlled dangerous drug and controlled paraphernalia. See *Folk v. State,* 11 Md.

App. 508; *Downes v. State,* 11 Md. App. 443; *Wilkins v. State,* 11 Md. App. 113; *Jackson v. State,* 10 Md. App. 337. Therefore the lower court was not clearly wrong in its judgments on the evidence. Maryland Rule 1086; *Williams v. State,* 5 Md. App. 450.

*Judgments affirmed.*