THOMAS HUDSON, JR. *v.* STATE OF MARYLAND

[Nos. 10 and 11, September Term, 1972.]

*Decided August 8, 1972.*

50

The cause was argued before ANDERSON, ORTH and GILBERT, JJ.

*Henry M. Rutledge* for appellant.

*David B. Allen, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Fulton B. Jeffers, State's Attorney for Wicomico County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

On 28 July 1971 criminal case 6510 came on for trial by the bench in the Circuit Court for Wicomico County. The indictment therein presented that THOMAS HUDSON, JR. on 4 October 1970 did possess heroin "in sufficient quantity to reasonably indicate under all the circumstances an intent to manufacture and distribute" (1st count), that on 2 October 1970 he did maintain a certain common nuisance at room 200, Stateman Motel, 712 N. Salisbury Boulevard, Salisbury, Maryland "which was then and there resorted to by drug abusers for purposes of illegally administering Controlled Dangerous Substances and was used for the illegal Manufacture, Distribution, Storage and Concealment of Controlled Dangerous Substances" (2nd count), and that on 4 October 1970 he did possess heroin (3rd count), all unlawfully. He was found guilty generally, thus convicting him under each of the three counts. *Manning v. State,* 2 Md. App. 177, 181. On 5 November 1971 he was sentenced to 20

years under the 1st count, to 10 years under the 2nd count "to run concurrent", and to 4 years under the 3rd count "to run concurrent." He appealed. The case is docketed in this Court as no. 10, September Term, 1972.

On 19 October 1971 criminal cases 6807 and 6846 came on for trial before a jury in the Circuit Court for Wicomico County. In 6807 the indictment presented that Hudson did possess heroin "in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture and distribute" (1st count), that he did possess controlled paraphernalia (2nd count), that he did conspire with Marie Stewart to violate the controlled dangerous substances law of Maryland (3rd count), and that he did possess heroin (4th count), all on 13 June 1971 and all unlawfully. In 6846 the indictment presented that on 13 June 1971 he did unlawfully maintain a common nuisance at Poplar Street, Fruitland, Wicomico County, Maryland "which was then and there resorted to by drug abusers for purposes of illegally administering controlled dangerous substances and was used for the illegal manufacture, distribution, storage and concealment of controlled dangerous substances, * * * to wit heroin." He was found guilty under the 1st, 2nd and 4th counts in 6807, and of the offense as charged in 6846. On 5 November 1971 in 6807 he was sentenced to 20 years under the 1st count and to 4 years under the 2nd count, "each to run concurrently with the sentence in no. 6510 Criminal Cases." [1] In 6846 he was sentenced to

---

1. As to the conviction under the 4th count in 6807 the ultimate result was that no sentence was imposed. A sentence of 5 years was first declared. Upon suggestion of the prosecutor that the maximum sentence authorized was 4 years, see Code, Art. 27, § 287 (e), the court reduced the sentence to 4 years. Defense counsel told the court he believed that the 4th count merged into the conviction under the 1st count "because they are both possession." The court said, "All right, we so rule." The docket entries do not reflect a sentence as to the 4th count.

On each of 26 August 1971 and 15 October 1971, an addendum pursuant to Maryland Rule 713 was filed, which by title pertained to No. 6846 Criminal Cases, although it appears from the content of that filed on 26 August that it was with regard to No. 6807. In any event, Hudson elected to have the issue of his being a subsequent offender tried separately and at the penalty stage of the

10 years "to run concurrently with the sentence in no. 6510 Criminal Cases." He appealed. The case is docketed in this Court as no. 11, September Term, 1972.

# I

In each case the evidence necessary to conviction was seized under the authority of a search and seizure warrant valid on its face. In each case the validity of the warrant was challenged on the ground of the sufficiency of the affidavit upon which it was issued. In no. 10 the challenge was in the form of an agreement between the prosecution and the defense presented to the court at the start of the trial that the only issue was the validity of the warrant—"The guilt or innocence will be determined by the ruling on the search warrant." A hearing was conducted on oral motions to suppress the evidence and to declare the warrant invalid and the motions were denied. In no. 11 a pretrial motion to suppress was filed. It was heard out of the presence of the jury and denied. In the appeal in each case Hudson claims the lower court erred in its ruling. We do not think it did in appeal no. 10. We think it did in appeal no. 11.

*The Search Warrant in no. 10*

Hudson claims that the warrant in appeal no. 10 "was contingent upon an unnamed informant whose reliability was not sufficiently proved."

The warrant, issued 3 October 1970, commanded the search of the Statesman Motel, Room #200, 712 N. Salisbury Blvd., Salisbury, Wicomico County, Maryland, "now occupied by Thomas Hudson, Jr. and all other persons", and the seizure of all controlled dangerous substances and narcotic paraphernalia found.

The application for the warrant was supported by the affidavits of Trooper David D. Luce of the Maryland State Police and Patrolman Elton R. Gravenor of the Salisbury Police Department who stated they had prob-

---

proceedings the court said: "I am not going to sentence him as a second offender." It seems that the subsequent offender issue was never tried.

able cause to believe that controlled dangerous substances and narcotic paraphernalia were being secreted and administered on the premises in violation of Code, Art. 27, § 286. The basis for the belief was spelled out. On 30 September 1970 George Neal, assistant manager of the motel, known to the affiants "as a reliable respected person in the community of Salisbury, Maryland", told the affiants that on 25 September he had rented room 200 to Hudson. During the next five days "numerous persons both male and female, have frequented Unit #200 at all hours of the day and night." Two persons who visited the room many times were Shirley Parker and Victor Anderson, each of whom was known to the affiants as a narcotics user. Another was Clarence Johnson, alias Speedy, known to the affiants to be a close friend of Hudson. Investigation initiated by the affiants disclosed "numerous long distance phone calls" made from room 200 and that the numbers called were listed "to several persons known to the Federal Bureau of Narcotics and Dangerous Drugs as narcotics users and peddlers." The room was placed under surveillance. On 1 October at 10:25 p.m. a white male entered the room, stayed "only moments" and left. At 10:47 p.m. a "colored female" came out of room 210, entered room 200, stayed 3 minutes and returned to room 210. At 11:17 p.m. the white male who had previously entered the room returned. He remained in room 200 for 7 minutes and left, placing a small object in his left rear pocket. On 2 October at 8:38 p.m. Hudson entered room 200 carrying a small brown paper bag. He was accompanied by George Townsend and Charles Downing, known to the affiants as narcotics users and peddlers, and by an "unknown colored male." Twelve minutes later Downing went to a Plymouth automobile, got therefrom a plastic toothbrush case and partially concealing it in his hand went back to the room. At 9:15 p.m. Wilson Wright, Jr. and David Brayboy, known to the affiants as narcotics users and peddlers in the Salisbury area, entered room 200. Ten minutes later Brayboy left the room and was observed by a confidential

informant holding a small piece of cotton or tissue paper, on which was a small spot of blood, in the crook of his left arm. The cotton or tissue was known to the affiants "as part of the procedure of administrating hypodermic injections to an individual, either by self administration or by another subject." At 9:30 p.m. the confidential informant knocked on the door of room 200 and was permitted to enter. There were four men in the room. The one who opened the door had "a handful of money in his left hand." Another was "sitting on the bed with a nylon stocking tied on the upper portion of his left arm. The subject was holding a hypodermic syringe in his right hand getting ready to inject himself." The affiants stated that the confidential informant had assisted them "in four narcotics investigations over the past three weeks, which had led to the arrest of two persons for violations of the controlled and dangerous substance laws."

The warrant was executed on 4 October 1970 at 5:00 a.m. Hudson answered the officer's knock on the door. Shirley Mae Parker and John Curtis Evans were also in the room. The officers found and seized 121 decks of heroin from a suitcase belonging to Hudson, a deck of heroin from the pocket of a shirt worn by Shirley Mae Parker, a .32 caliber revolver in a dressing table drawer and $335 in U. S. currency.

The validity of the warrant is to be determined in the light of established propositions specifically affirmed in *Spinelli v. United States*, 393 U. S. 410, 419, noted by us in *Price v. State*, 7 Md. App. 131, 137, and set out in *Buckner v. State*, 11 Md. App. 55, 62:

"1) the standard of probable cause is only the probability and not a *prima facie* showing, of criminal activity;

2) affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial;

3) issuing judges are not to be confined to nig-

gardly limitations or by restrictions on the use of their common sense in judging probable cause;

4) the determination of probable cause by the issuing judge should be paid great deference by reviewing courts."

These propositions are to be followed in applying the rules governing probable cause for the issuance of a search and seizure warrant which we summarized in *Buckner* at 61-62 and repeated in *Moore v. State,* 13 Md. App. 711, 714-715:

> "A judge may issue a search warrant when it is made to appear to him by a written application signed and sworn to by the applicant, accompanied by an affidavit containing facts within the personal knowledge of the affiant, that there is probable cause to believe that a crime is being committed by any individual or in a building within his territorial jurisdiction, and that evidence of the crime is upon the person or within the place to be searched. * * * Probable cause is less than certainty or demonstration but more than suspicion or possibility. It is to be determined by the judge to whom application for the warrant is made. If a prudent and cautious man would be justified from the facts presented in the affidavit in believing that the offense has been or is being committed, the warrant properly may be issued. In determining the existence *vel non* of probable cause, the judge may give consideration to the special significance which objects, happenings, and individuals may have conveyed to a trained, experienced and knowledgeable police officer making the affidavit accompanying the warrant. * * * And the affidavit may be based on hearsay information, even from an unidentified informant, and need not reflect the direct per-

sonal observations of the affiant, but it must contain some of the underlying circumstances from which the affiant could be reasonably justified in a belief that the hearsay information was reliable or the informant was credible. * * *

When a search warrant is challenged, the lower court, and the appellate court when the determination of the lower court is before it on appeal, must look for probable cause only in the affidavit itself and may not go outside it. * * * However the affidavit should be interpreted in a commonsense and not in a hypertechnical manner, and the resolution of doubtful or marginal cases should be largely determined by the preference to be accorded to warrants. * * * But * * * this is not to say that probable cause can be made out by affiants which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists." (citations omitted)"

We observed in *Moore,* at 715-716:

"Thus probable cause may be shown in the affidavit by a statement by the affiant 1) of his direct observations, or 2) of information furnished the affiant by someone else, named or unnamed, or 3) of a combination of the direct observations of the affiant and hearsay information furnished him. In each instance the issuing judge must have before him enough circumstances to enable him to determine the trustworthiness of the information, for he must not only evaluate the adequacy to show probable cause of the facts and circumstances set out in the affidavit but he must also evaluate the truthfulness of the source of the information comprising those facts and circumstances. Due to the infinite variety of human conduct, the suffi-

ciency of any affidavit must necessarily depend upon the particular facts and circumstances in it contained."

We noted, note 2 at 715, that a problem arises with respect to the truthfulness evaluation only when hearsay information is involved. As to the direct observations of an affiant the "oath, as a trustworthiness device, establishes, *per se,* the credibility of the affiant-source, and thereby, the reliability of his directly observed information", quoting *Dawson v. State,* 11 Md. App. 694, 699.

Here probable cause was shown in the affidavit by a combination of the direct observations of the affiants and hearsay information furnished them. The hearsay information came from two sources, a named informant and an unnamed "confidential" informer. The reliability of the named informant, George Neal, the assistant manager of the motel, presents no problem. That he was named gives some basis to credit the information given by him, *Holland v. State,* 13 Md. App. 635, 639, but in any event the reliability of what he imparted was established by the personal observations of and investigation by the affiants. They checked the registration of the room, they observed known narcotics users and peddlers frequent the premises and they found that phone calls were made from the room to numbers listed to known narcotics users and peddlers. These observations by the affiants also go to establish the reliability of the unnamed informer, buttressing the fact that the informer had assisted the affiants in four narcotics investigations within the past three weeks which resulted in the arrest of two persons for violations of the narcotics laws. See *Johnson v. State,* 14 Md. App. 721. And the information furnished by the direct observations of the informer is to be evaluated with regard to the personal knowledge the affiants had of the background of those frequenting the room. See *United States v. Harris,* 403 U. S. 573. We think that in all the circumstances shown in the affidavit the information received from the un-

named informer was redolent with assurances of trustworthiness and that his reliability was sufficiently proved. Thus the information given by him may properly be considered in determining the existence of probable cause. With it the facts in the affidavit clearly were sufficient to justify a prudent or cautious man in believing that acts in violation of the narcotics laws were being committed in the room. We hold the lower court did not err in upholding the validity of the warrant and denying the motion to suppress the evidence seized thereunder.

*The Search Warrant in no. 11*

The search warrant in appeal no. 11 issued 11 June 1971, commanded the search of a green, one story, frame bungalow situated on the east side of Poplar Street, Fruitland, Wicomico County, Maryland and occupied by Hudson, also known as "June", and Marie Stewart and the seizure of all evidence and paraphernalia used in the illegal distribution or possession of controlled dangerous substances and other prohibited drugs. Without question the application on its face shows probable cause for the issuance of the warrant. But Hudson claims that certain matters it sets out may not be considered because of the rules concerning reliability of informers and he urges that without those matters the application lacked "proof. competent to focus suspicion on the premises to be searched."

The affiant was Luce. The meat of his affidavit was told him by other persons rather than gained through his personal observations or investigations. At times, in material part, the person communicating the information to Luce had not acquired it by personal observation or investigation but in turn had been told it by another person. The initial inquiry is whether there were enough circumstances set forth in the affidavit to enable the issuing judge to evaluate the truthfulness of the sources of the information.

The information in the affidavit came to Luce through three unnamed informants, the State's Attorney for Wicomico County, the Sheriff of Wicomico County and

an unnamed officer of the Maryland State Police. We consider the information supplied by each.

*The First Informant*

The credibility of the first informant was sufficiently shown. According to Luce, that informant had:

1) conducted or participated in many investigations of violations of the controlled dangerous substances laws and furnished information to the federal authorities which "has led to the arrest of approximately twenty persons, the most recent being in August and September 1970 for which the accused stands indicted for the offenses";

2) been a heroin addict in the past and as such was knowledgeable to all aspects of identification and usages of controlled dangerous substances;

3) received special training from the federal bureau in the identification and handling of violations of the dangerous substances laws;

4) purchased quantities of controlled dangerous substances both in large and small quantities on many occasions for agents of the federal bureau.

About 10 March 1971 he was assigned to the Salisbury-Wicomico area. He infiltrated "a group of persons active in the trafficking of heroin and other controlled dangerous substances and was able to purchase small quantities" of such drugs. As we read the affidavit this was known to Luce by his own observations. The affidavit then reads:

"That during these purchases the reliable informant learned the identity of the main supplier of heroin in the Salisbury area to be Thomas Hudson, also known as 'June'.

That Thomas Hudson, also known as 'June' would make regular trips to the Baltimore-

> Washington area and bring large quantities of heroin into the area for distribution throughout the area either by distributing himself or having several other persons distribute for him."

How the informant "learned" that Hudson was the main supplier is not explained and the grounds for a conclusion that he was, are not set out. Nor does there appear any basis for Luce's statement about Hudson's trips to the Baltimore-Washington area. The affidavit next states that the informant "was able to determine through conversations with known narcotic distributors" that Hudson was "delivering approximately $2000 in heroin to the Salisbury area per week." The credibility of the "known narcotic distributors" from whom the informant received this information was not shown nor is it indicated who knew them to be narcotic distributors, Luce, the informant, or others. Even though the credibility of the informant himself was shown, we do not believe that there were "sufficient data in sufficient detail" for the issuing judge to make an independent judgment of the reliability and worth of the information that Hudson was the main supplier, that he brought in large quantities of heroin for distribution and that he was delivering $2000 worth of heroin a week.

## The Second Informant

Luce asserts that the reliability of the second informant "has not been established by the assistance in narcotic cases in the past." On 14 October 1971 this informant told Luce he had bought a $10 bag of heroin from "a Negro subject in the area of the Blue Tango Night Club, Salisbury, Wicomico County, Maryland." Luce claims his reliability was established by the fact that the substance he said he bought proved on analysis to be heroin. We do not feel that this alone is enough. What it amounts to is that because what the informant said was heroin was in fact heroin everything else he said is to be believed—that he bought it, when he bought

it and from whom he bought it. The informant ties Hudson into the unlawful activities by saying that the person from whom he bought the heroin said it was Hudson's stuff and that he was dealing it for Hudson. There is nothing to show the credibility of the unnamed seller. The affidavit continues:

> "That on April 2, 1971 at 9:30 PM the same informant contacted Thomas Hudson Jr. also known as 'June' at Room #23 of the Franklin Hotel, Salisbury, Wicomico County, Maryland and had certain conversation with him regarding the purchase of a quantity of heroin. Thomas Hudson Jr. also known as 'June' delivered hand to hand at that time a small glassine bag containing a white powder substance to the informant for the price of $12.00. The aforementioned glassine bag just prior to delivery was hidden under a pillow on Thomas Hudson Jr.'s, also known as 'June', bed, in Room #23 Franklin Hotel as aforesaid."

We can only construe this as being told to Luce by the informant. There is nothing to indicate that any of it was personally observed by Luce. Again the only basis for the informant's reliability was that the powder he said he bought proved to be heroin. On 20 May the informant told Luce that Hudson had moved to a green, one story, wood frame bungalow on the east side of Poplar Street in Fruitland and that Hudson was living there with a Marie Stewart. The informant told Luce that Hudson told him "that he had moved to the aforementioned residence to have a remote location where he could bring in large quantities of heroin, adulterate the substance, package it himself and not be detected. The informant said he had observed numerous persons known to him to be heroin addicts in the bungalow. This information would be of significance coming from the informant only if the informant's reliability were established. The informant told Luce that Hudson's profits were be-

64

tween $3000 and $5000 a week, but again this is a bald assertion. On 21 May 1971 the informant bought a $10 bag of heroin from a Negro male in the vicinity of Lake Street in Salisbury. The seller told him he was delivering for Hudson as well as several other persons in the area. This also was apparently told to Luce by the informant, there being nothing in the affidavit to indicate that Luce personally saw any part of the transaction or overheard any of the conversation.

### The Third Informant

Luce asserts that the reliability of the third person from whom he received information "has not been established" but he says that he "is a reliable, responsible person in the community." The information from this informant was that he saw Hudson in the house in Fruitland when he went to collect a bill. He observed "a large roll of money" in Hudson's possession. This informant's reliability was not established by the affiant's unsupported and unparticularized conclusory assertion that he "is a reliable, responsible person in the community." See *Iannone v. State*, 10 Md. App. 81, 85.

### The State's Attorney for Wicomico County

The State's Attorney for Wicomico County told Luce that he had received a telephone call from a Mr. George Porter, address unknown, telephone number 749-6824, "a local Salisbury exchange", who said that "a Negro male, name unknown, is selling heroin from a house in the Fruitland area, for $10.00 and $20.00" and that the "dealer" was "building a wall at the front portion of his dwelling which was white in color." If any effort was made to ascertain the credibility of Porter or the reliability of his information, it is not reflected in the affidavit. All that Luce did, as far as can be determined from the affidavit, was to note that he had observed that Hudson's house in Fruitland had "a white wall which embraces the front portion" of the residence. This did not amount to such underlying circumstances from which

the issuing judge could be reasonably justified in a belief that the State's Attorney's informant was credible or the hearsay information was reliable. See *Kist v. State,* 4 Md. App. 282.

## The Sheriff of Wicomico County

The Sheriff of Wicomico County informed Luce on 9 June 1971 that he had been told by "a reliable informant" that the informant's son was employed by Hudson but in what capacity he had been unable to ascertain. The son received $125 a week and spent the "majority of his time, along with other persons" in Hudson's house in Fruitland. The Sheriff deemed the informant reliable because he had "delivered valuable information in the past which had led to the arrest of numerous persons for various violations of the States Statutes and violations of the Controlled Dangerous Substance Law as aforesaid." In *Moore v. State, supra,* at 718, we found that comparable underlying facts were not sufficient in the light of their lack of specificity. Of course, that the Sheriff may be considered to be a reliable person is not of itself sufficient. He was merely a conduit of the information received from his informant and it is the credibility of that informant that is involved. See *Bolesta v. State,* 9 Md. App. 408, 413.

## The Maryland State Police

The affidavit sets out that on 7 June 1971 the Maryland State Police Barracks E in Salisbury received an anonymous telephone call that "a Negro male was selling narcotics at a house in Fruitland with a white stone or cement fence around the dwelling, which is next to Twilley Apartments." Luce stated he was "readily able to identify this residence" as that of Hudson due to the fence and proximity to the Twilley Apartments. We do not feel that an anonymous telephone call as such may serve to establish probable cause. Information received in such manner is to be distinguished from information

received from witnesses to a crime at the scene shortly after its commission. See *Evans v. State,* 11 Md. App. 451, 457; *Knight v. State,* 7 Md. App. 282, 285-286.

*The Observations and Personal Knowledge of the Affiant*

Luce swore that he knew Hudson was "a distributor of controlled dangerous substances which is evidenced by the seizure of 134 bags of heroin which was seized on October 3, 1970 from Hudson at the Best Western States-man Motel, Route 13, Salisbury, Wicomico County, Maryland." And he knew that Hudson "stands accused in Vice-Narcotic case number 23-A-57 and has been indicted by the Wicomico County Grand Jury for possession of heroin." See *supra* with respect to appeal no. 10. Luce also knew from field tests and laboratory examinations he caused to be conducted that the substance the second informant said on several occasions he purchased was in fact heroin. And Luce personally observed the alleged residence of Hudson and observed a white wall along the front of the property. It seems that this is all he knew of his personal knowledge.

It is all too clear that probable cause was shown in the affidavit only through the hearsay and double hearsay information given Luce and that information within his personal knowledge was not sufficient to establish probable cause. We have found that if the first informant be deemed credible there were not enough underlying facts and circumstances set out to permit the issuing judge to find his information reliable. We have found also that other informants who were not merely conduits of information given them were not shown to be credible as required. And even if we were to adopt the reasoning of the plurality of four justices in *United States v. Harris,* 403 U. S. 573 that a police officer's personal knowledge of a suspect's background and the fact that an informant's declaration was against his own criminal interest could be of value in determining the credibility of a first-time informant, we do not believe the gap is bridged. All that Luce personally knew about Hudson, according to the affidavit, was that he had been arrested about eight

months before with a large quantity of heroin in his possession and had been indicted therefor. The affidavit does not reflect that Luce personally knew even that Hudson occupied the premises to be searched. We are restrained to the conclusion that the affidavit did not demonstrate probable cause for the issuance of the search warrant. We hold that the lower court erred in denying the motion to suppress the evidence.

This determination with respect to appeal no. 11 requires reversal of the judgments therein reviewed. The judgments are reversed without grant of a new trial because it is patent that with the exclusion of the articles seized under the invalid warrant there is no evidence legally sufficient to sustain the convictions. See *Williams v. State,* 5 Md. App. 450. Therefore, we do not reach the other two questions presented.[2]

## II

We deal with the remaining two questions presented in appeal no. 10. Hudson asks: "Was the determination of [his] guilt or innocence, judged solely by the determination of the validity of the search warrant, contrary to the criminal law standards of this State?"

When the case came on for trial it was agreed between the prosecution and the defense that the State's case was fully proved by the evidence seized· by the police. In other words, if that evidence was not excluded, Hudson had no defense to the charges. Therefore, the case stood or fell on the validity of the search warrant under the authority of which the evidence was seized. If that warrant was valid the search and seizure by which the evidence was obtained would be reasonable and the evidence properly admissible. The lower court pinned down

---

2. They were:
   (2) "Was the proof presented to the jury sufficient to provide a rational inference that every necessary element existed for the crimes of drug distribution and maintenance of nuisance?"
   (3) "Did the instructions of the Trial Judge taken as a whole present fairly and accurately the law applicable to provision with intent to distribute?"

the agreement: "The guilt or innocence will be determined by the ruling on the search warrant, is that correct? * * * Then, if the search warrant is valid, then he is guilty—if the search warrant is invalid, then he is not guilty—is that correct?" The prosecutor and the defense counsel each answered: "That's correct, Your Honor." The State's Attorney added: "But it does appear to us, and we are in full agreement, that this is really the crux of the issue in this case." An evidentiary hearing on the validity of the warrant followed and after full argument the court denied a motion "to suppress the evidence which was seized" and "to find the warrant invalid." It was then stipulated by the State and the defense that the return on the warrant "was timely filed; and that the items seized were seized as reported and from the location reported, being Room #200 of the Statesman Motel, occupied by Thomas Hudson, Jr., which consisted of—and we are stipulating as to what the material was—one deck of suspected heroin seized from the shirt pocket of Shirley Mae Parker; 121 decks of suspected heroin seized from the blue suitcase, the property of Thomas Hudson, Jr.; $335.00 in U. S. currency; one .32 caliber revolver found in dressing table drawer. It is my understanding that we are stipulated that these are the items which were found. We are also stipulating, we do have the laboratory report, which will be accepted, that the substance found was, in fact, heroin." Defense counsel said: "Now, Your Honor, at this point the defense will not offer any testimony." The court rendered a verdict of guilty.

Hudson now urges that this procedure, expressly agreed to by him, "amounted to an acceptance of a guilty plea by the Court in absence of the safeguards required by *Williams v. State,* 10 Md. App. 570 and *McCall v. State,* 9 Md. App. 191. We see no merit in this contention. It is perfectly clear that the case was submitted to the court as the trier of fact on a plea of not guilty and that evidence was supplied by stipulation. There is no constitutional obligation to apply the rules invoked upon

a plea of guilty in these circumstances and we refuse to do so.

Hudson also asks did the failure of the lower court "to allow subsequent argument on a Motion for a New Trial unlawfully deny" the effective assistance of counsel?" He heads his argument on the question in this wise: "Denial of the new trial motion in the presence of neither appellant nor his counsel constitutes prejudicial and reversible error."

What happened was this. On 28 July 1971, upon the verdict of guilty, the court granted defense counsel's request that sentencing be delayed pending a motion for a new trial. The motion was timely filed.[3] The motion came on for hearing before the court on 18 October 1971. See Rule 759 a; Code, Art. 27, § 594. The transcript of the proceeding affirmatively shows that Hudson's trial counsel was present. The court said to him: "You are the moving party, and we will hear from you now." The transcript reads:

> "(Argument on the motion for a New Trial)
> THE COURT: All right. I will read that case before I do anything in this matter. All right, Mr. McRae [Jay G. McRae, Jr., Esq., defense counsel].
> MR. McRAE: Thank you, Your Honor."

The docket entries under date of 18 October 1971 read that the motion was held *sub curia* and under date of 19 October that it was denied. On 5 November 1971 Hudson appeared before the court for sentencing in criminals 6510, 6807 and 6846. Counsel representing him at each of the two trials were present. Trial counsel in no. 6510 suggested to the court that the order denying a new trial in that case had not been made in the presence of Hudson or his counsel. The court explained that he had

---

3. It prayed for a judgment N.O.V. or, in the alternative, for a new trial. We are not aware of a statute, rule or judicial opinion in this jurisdiction providing for a judgment N.O.V. in a criminal cause. Rule 563 applies to procedure at law only. Rule 1 a 1.

held final determination of the motion *sub curia* so he could read several cases cited by counsel. "I read those cases and I didn't think they were of any real support for your proposition and, of course, I entered the order the next day." The matter having been decided, the court refused to hear anything more on the motion for a new trial (counsel mentioned another case, *Dawson v. State,* 11 Md. App. 694). In the circumstances we think that the mere formal rendering of the decision as to the motion for a new trial was not such a stage of the trial as to require the presence of Hudson. Nor was it such a critical stage of the proceedings as to make the presence of his counsel a matter of constitutional necessity. And we do not see any abuse of judicial discretion in the refusal to reopen the argument on the question of a new trial, both Hudson and his counsel having had full opportunity to be heard at the hearing on the motion. We find inapposite *Yopps v. State,* 228 Md. 204 and *Moore v. State,* 7 Md. App. 330, cited in Hudson's brief. They were concerned with the right of an accused to have his counsel argue the merits before entry of a verdict in the guilt stage of the proceedings.

> *As to criminal 6510 below (No. 10 on appeal), judgments affirmed.*
>
> *As to criminals 6807 and 6846 below (No. 11 on appeal), judgments reversed.*