981 A.2d 675

**Douglas MALARKEY**

v.

**STATE of Maryland.**

**No. 3067, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Oct. 2, 2009.

128

Robert C. Bonsib (Marcus Bonsib, LLC, on brief), Greenbelt, for Appellant.

Diane E. Keller (Douglas F. Gansler, Atty. Gen., on brief), for Appellee.

Panel: HOLLANDER, JAMES R. EYLER, JAMES A. KENNEY, III (Retired, specially assigned) JJ.

HOLLANDER, J.

Douglas Malarkey, appellant, a Takoma Park police officer, was charged with second-degree assault of John Courtney, in violation of Maryland Code (2002, 2008 Supp.), § 3–203 of the Criminal Law Article ("C.L."). As a result of the alleged assault, Courtney suffered a collapsed lung and three fractured ribs. Following a trial in the Circuit Court for Prince George's County, appellant moved for judgment of acquittal; the circuit court reserved ruling and submitted the case to the jury. When the jury was unable to reach a unanimous verdict, the court declared a mistrial. Thereafter, appellant filed a post-trial "Motion for Judgment of Acquittal" and a "Supplemental Motion to Dismiss on the Basis of Violation of Principles of Double Jeopardy and Due Process," which the circuit court denied.

Prior to his re-trial, appellant noted this appeal. He presents three issues for our review, which we quote:

I. Whether re-trial of appellant is barred by the principles of double jeopardy and due process.

II. Whether the state failed to present a legally sufficient case and is barred from retrying the appellant.

III. Whether *State v. Sirbaugh,* [27 Md.App. 290, 339 A.2d 697 (1975),] if still of any precedential value, should be overruled or, in the alternative, is not constitutionally valid as applied to the instant case.

The State has moved to dismiss the appeal, claiming it is premature because no final judgment has been entered. For the reasons that follow, we shall dismiss the appeal.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

On January 8, 2006, appellant was off-duty, working the night shift as a security officer at Popeye's Restaurant in Takoma Park. While Malarkey was at work, Sergeant Daniel Frishkorn issued a broadcast concerning a fleeing suspect, which Malarkey heard. The suspect was later identified as Courtney.

Officer Derrick Fields, Sr., a patrol officer for the Takoma Park Police, testified that at around 1:58 a.m. on January 8, 2006, "Corporal Malarkey came over the radio that he saw the person we were looking for [earlier] and that he had him running behind the Red Top gas station."[2] According to Fields, appellant "seemed kind of hyped, like it was, I don't know, like he had just caught a known terrorist or something." Fields proceeded to the scene, and exited his car with his "gun drawn." He saw "Mr. Courtney standing in a frozen position because it was like he didn't have anywhere else to run." Fields explained that he handcuffed Courtney because "he may have ... done something heinous.... So that's why we

---

1. The case was tried to a jury beginning on May 14, 2007. The alleged victim of the assault, John Courtney, was served with a subpoena but failed to appear.

2. Malarkey's radio broadcast regarding Courtney was played for the jury.

cuff him, for his safety and my safety." Nevertheless, Fields indicated that he did not "feel threatened," nor was he in fear. He said: "It was just a person that, you know, was running and now we caught him." [3]

Fields told Courtney "to get down . . . on the ground," and Courtney "never resisted. He just complied totally. . . ." Fields continued:

> . . . I had him lay down on his stomach and spread his arms out to the side. . . . I walked over to cuff him. I had one cuff on him and that's when Corporal Malarkey came from my left side, took me by surprise. And all I heard was this thud and Mr. Courtney was like, he had just been deflated, just a big gasp of air just came out of him. So he immediately started complaining that his back and side was hurting.
>
> At that time, I stepped away. Corporal Malarkey had the right hand and then took his left hand and put it in the cuffs. When he cuffed him, he told him, mother fucker, you'll never run from me again. So he yanked him over onto his side, got him sitting on his butt and he lifted his arms up behind him so that Mr. Courtney could be standing on his feet. He never gave Mr. Courtney a chance to help assist him get himself up off the ground.
>
> At that time, Courtney still wasn't fighting he was totally compliant. [Appellant] walked him over to the car and slammed him onto the car. . . . [4]

---

**3.** Fields also said: "I didn't feel any fear when I went to him. He wasn't moving. He wasn't fighting. As I approached him, there was no suspicious movements from him."

**4.** Fields conceded that "the straddling handcuffing technique" he used "may not be the safest." He explained: "Because the person could get up and you're off balance. If their body is in-between your legs, they can roll over and knock you down or they can get up and knock you back."

In a recorded pre-trial statement that Fields gave to Sergeant Tyrone Collington, Fields stated that Malarkey had "leaned" Courtney over the trunk. Appellant's attorney also established that Fields did not use the word "slammed" in his description of the incident.

In describing Malarkey's conduct, Fields said: "It wasn't gentle. Nothing about it was gentle." Fields denied that Malarkey appeared to be injured when Malarkey dropped his knee onto Courtney's back. Nor did he believe that Malarkey "tripped on Mr. Courtney."

As Courtney had an open warrant for violation of parole, he was arrested. On the way to the police station, Courtney complained "that he was in pain" and wanted "medical attention." Fields stated: "He wasn't injured prior to our contact because if he was, he wouldn't have been running like that. If his ribs had been broken, he wouldn't have been running like that. He wouldn't breathe that well."

Officer Paula Gaskin testified that she heard Malarkey's call over the radio, indicating that he was chasing a man spotted earlier in the evening by Sergeant Frishkorn. According to Gaskin, when Malarkey approached the scene, Courtney "was already detained ... and the situation was already under control...." Malarkey was "really excited and irate, [and] was cussing." Gaskin claimed that Malarkey "lifted his knee and came down with all his weight and hit Mr. Courtney in his back." Malarkey turned Courtney over and "slightly kneed him again into like his stomach area." Then, appellant "yanked [Courtney] up in-between the cuffs up off the ground, dragged him to the cruiser and slammed him into the trunk." According to Gaskin, "Mr. Courtney did not resist. He complied with everything Officer Fields told him to do. He was already face down on the ground. He was no threat." *Id.*

Jerome Irwin, a corporal with the Takoma Park Police Department, responded to Sergeant Frishkorn's call about a man running from him. He also heard Malarkey's call on the radio, indicating that he spotted the man Frishkorn had been chasing. Irwin proceeded to the location identified by Malarkey. As he approached, he saw Officer Fields handcuffing Courtney. When Malarkey arrived, "[h]e exited his car very fast." Irwin continued:

> [Malarkey] ran over to Officer Fields, and the guy was on the ground, and he paused for a second and dropped down

on the guy with knees, with both knees. He completed the handcuffing process. Officer Fields kind of backed away at that point, and Officer Malarkey was pretty excited. He was cursing at the guy. He called him bitch, mother fucker.

Further, Irwin claimed that Malarkey lifted Courtney off the ground and "slammed him up against the cruiser." Courtney was "grunting and groaning" when Malarkey picked him up.

On cross-examination, Irwin recalled that Officer Fields had Courtney "prone on the ground" and "in a high risk position." When Malarkey "came on the scene," he (Malarkey) saw that Fields "had engaged in a high risk cuffing procedure...." Irwin agreed "that in that high risk situation, it was important to have Mr. Courtney cuffed and to cuff quickly[.]" Nevertheless, he said: "I didn't think this guy posed a threat at this particular time." He added: "[I]f you have someone compliant, the risk is not as great as if someone is flailing arms or trying to resist you or refusing to be handcuffed. It's different."

On January 8, 2006, Iraj Almas was employed as a Takoma Park patrol officer. She recalled the radio transmission from Frishkorn about a man running from him. After Malarkey called, stating that he had spotted the man Frishkorn had described, she "went to back him up." At the scene, she saw Frishkorn, Gaskin, Fields, and Irwin; Courtney was on the ground. Almas stated: "He was on his knees crunched over and his hands were handcuffed behind his back, and Corporal Malarkey was standing next to him.... And Mr. Courtney was not resisting arrest." She continued:

> And then Corporal Malarkey grabbed Mr. Courtney by his handcuffs and snatched him up off the ground pulling his arms all the way up against the rotation of his shoulders. And then Corporal Malarkey walked him about six feet to the cruiser and slammed [5] him on the trunk of the cruiser

---

5. On cross-examination, appellant's attorney pointed out that Almas did not mention in her police report that Malarkey "slammed" Courtney on the trunk of the car.

face down first. Mr. Courtney was still complying, not resisting arrest. Mr. Courtney . . . was hurt.

Sergeant Frishkorn instructed Almas "to take Mr. Courtney to the station for processing." While in the cruiser, Courtney complained of "really bad chest pains." Accordingly, at the instruction of Officer Gaskin, Almas took Courtney to Washington Adventist Hospital.

The parties stipulated as follows: On January 8, 2006, Courtney was admitted to Washington Adventist Hospital (the "Hospital") "with complaints of wheezing, chest and back pain, coughing sputum and trouble breathing. He reported the police injured him." Dr. Frank Shin, a radiologist at the Hospital, reviewed Courtney's x-rays, diagnosed a "punctured lung cavity with air between the lung and chest wall," and opined that this condition "is usually caused by trauma to the body." Courtney was treated at the University of Maryland Medical Center on January 13, 2006, for "complaints of trouble breathing, chest, back and rib pain." At that time, Dr. Jeffrey Johnson discovered fractures of Courtney's "9th, 10th, and 11th posterior ribs and a left hemopheumothorax," which "is blood and air in between the lungs and chest wall. It is usually caused by some type of trauma to the body."

Dr. Jeffrey Johnson, who worked at the University of Maryland Shock Trauma Center, testified for the State as an expert in the field of trauma surgery. He stated that Courtney was transferred to the Shock Trauma Center on January 13, 2006. Johnson testified that Courtney initially reported that "he had been kicked several times," although there were "no visual clues" as to his injuries. Courtney was hospitalized for five days with a collapsed lung and three fractured ribs. Johnson opined that such "rib fractures" are caused by "blunt force."

At the close of the State's case, appellant's attorney moved for judgment of acquittal. He argued, in part:

As Your Honor knows, the analysis of the evidence in this case cannot be done in the way that the Court would do a normal second degree assault case. Normal second degree

assault, a citizen does not have the same right to use force as a police officer does.... [A]n officer has the right to use a certain amount of force in the performance of his duties.

In this case, all of the witnesses are consistent that the force that Officer Malarkey used began and ended within the scope of a very short period of time and while he was performing his official duties. There's no allegation that anything happened here that wasn't consistent with in [sic] the first instance, and part of his effort to handcuff and secure Mr. Courtney and then take him over to the vehicle where he was ultimately searched and immediately then turned over to others.

So the analysis of his conduct must be done in the context of his performance of his duties which means that, again, he has in a civil context what would be called qualified or discretionary immunity. I think in a criminal context what it means is the analysis of his conduct as whether or not it is excessive must be something well beyond what would be protected by qualified or discretionary immunity.

We have also argued in other parts of this case that there is a difference between what an officer may view as unnecessary in the context of the performance of one's duties and what was excessive. Whether Officer Malarkey's conduct was excessive has to be viewed on an objective police officer standard.

... Officer Irwin made the distinction between unnecessary and excessive and as the State's witness, basically, if believed, would support a motion for judgment of acquittal in this case because unnecessary force does not, as a matter of law, constitute excessive force and would not permit the State to carry its burden.

\* \* \*

As the Court knows, *Graham v. Connor* [490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)] sets sort of the general standard for what we do and how we analyze these cases. And it says, for example, that police officers are not liable for every push or shove they make nor for every

serious injury that may be inflicted during the course of their duties.

They're forced to make split second decisions under tense and dangerous and rapidly moving circumstances. And the ultimate issue of excessive force and the quest of excessive force involves an analysis of the reasonableness of that force from the perspective of a reasonable police officer on the scene rather than the benefit of 20/20 hindsight. It must be analyzed from the moment when the decision to use force was made.

I've got to tell you, Your Honor, everybody on the scene didn't think Mr. Courtney was seriously injured. The doctors at the hospital didn't think he was seriously injured. There was nothing in the context of what happened to make anybody think he was seriously injured. And I suspect that this ball got rolling because somebody with the benefit of 20/20 hindsight looked back and said, this guy's got cracked ribs, how did that happen, and it distorted the analysis of this.

Defense counsel continued:

But if we look at what Officer Malarkey knew at the moment when he did these things, we have State's witnesses saying that this situation required the drawing of a weapon. . . . Yet when you look through it, what [the witnesses] really said at the end of the day is we had a guy who represented a potential danger. Even Officer Fields who was the hands-on officer said, I didn't know if he was a murderer, and Officer Irwin who said he was a known, not known, a suspected drug user. Somebody who had fled from the police on numerous occasions.

So when Officer Malarkey arrives on the scene and you put yourself in his position on an objective basis, any police officer coming up in that situation, knowing what he knew, seeing what he saw, seeing Officer Fields in an unsafe position with one handcuff on, with all of the information he knew about, with an erratic suspected drug user, what is he to think? Is this a safe or potentially dangerous situation?

Does he have time to go up there and to ask a question? No.

Appellant's attorney concluded:

This case should not go any further. This case shows an officer who used force clearly in the performance of his duties at a time when the information that he possessed would cause an objectively reasonable police officer to believe that immediate and firm action was necessary.

Noting that the court must view the facts in the light most favorable to the State, the prosecutor responded: "Corporal Malarkey is charged with second degree assault. And the elements are, for second degree assault, that he caused offensive physical contact or physical harm to Mr. Courtney.... And by reading my stipulation, you can see that it was definitely offensive ... Three fractured ribs is offensive, and I think that's simply stated." The prosecutor continued: "Qualified immunity doesn't even apply here. This is a criminal case.... So to say this is not a normal second degree assault case, that an officer is allowed to use force, that's actually a misstatement of the law. An officer is not allowed to use force in every circumstance. It depends." In her view, the question of excessive force was one for the jury to decide.

The court reserved on the motion.

Sergeant Daniel Frishkorn testified for the defense. By the time of trial, he had worked as a patrol sergeant for eight years with the Takoma Park Police Department. Frishkorn recounted that he "received information that there was a suspicious person that was hanging out near the Sunoco ... and that this individual, every time they saw the police, they would run." He saw Courtney in the parking lot of the Sunoco on January 8, 2006; Courtney began to run, and Frishkorn chased him on foot, but could not catch him. At 1:16 a.m., Frishkorn broadcast a description of Courtney as a "suspicious person." [6] After Frishkorn lost track of Courtney,

---

6. Frishkorn's radio broadcast regarding Courtney was played for the jury.

he went to the Popeye's Restaurant, where Malarkey was working, talked to him about the incident, and "explained to him what I saw and everything and that this guy had gotten away from me a couple of times." After he left Popeye's, he heard Malarkey's call that he had spotted the man again and was chasing him.

At the scene, Frishkorn saw that "Officer Malarkey had Courtney on the back of the vehicle...." After Frishkorn searched Courtney, "Courtney said that he couldn't breathe." Frishkorn explained:

Initially, I thought that was a ploy for him trying to escape again ... I didn't see any injuries. He didn't say anything happened to him. All he said was that he couldn't breathe. I'm thinking, okay, this guy is going to try to escape, one, and two, he's probably out of breath because he's been running all over the place....

Frishkorn continued:

[Malarkey] said that he was making the arrest, that he came down on Mr. Courtney and he had told me that he was taking medication for his back. Flexeril I think is what it is. It's like a muscle relaxer. So when he came down, he had to come straight down instead of having some flexibility. And I took that along with the fact that there was no visible injuries, there was no purported claim of injury. Our policy says if there's a visible injury, no matter what it is, a person could have a little cut from handcuffs, you have to do a use of force report.

\* \* \*

When I talked to Officer Malarkey, he explained this about his back and explained he came down on the guy. Courtney never told me he was injured. There was no physical injury. There was no need for me to do a use of force report because, according to our policy, there was no use of force.

According to Frishkorn, the handcuffing of Courtney presented a high risk situation. He stated that if he saw someone handcuffing someone who was face down with their arms out,

as Courtney was, he "would take action. If I saw that the person didn't have them handcuffed within two seconds, I would move in and help them with the handcuffing...."

As of the time of trial, Fred Roush had worked for the Takoma Park Police Department for twenty-four years, mostly as a patrol officer. He testified that when he arrived at the scene on January 8, 2006, Courtney was already handcuffed and "was sitting on his rear end...." Roush recalled: "Officer Malarkey was having a conversation with Mr. Courtney. 'Why are you running from the police? When the police tell you to stop, you should stop.' Then at one point he picked him up and walked him over to a cruiser and bent him over the trunk of the cruiser to search him." According to Roush, "The suspect's hands were handcuffed behind his back [and appellant] picked him up by his right elbow."

Roush denied that there was anything "out of the ordinary or improper in the manner in which [appellant] placed" Courtney on the trunk. He also claimed that it did not appear that Malarkey injured Courtney. Roush recalled, however, that Courtney asked Malarkey why he was being detained, and Malarkey "was being distracted." Roush stated:

> And I was afraid this distraction, if he wasn't paying close enough attention, that and the fact that he had already foot chased this guy which gives you that adrenaline run and makes you stronger than you would normally be because you're chasing after him, I was afraid that as he was talking to this suspect, he wouldn't be paying enough attention to searching him and to how he was holding his arms up in the air. I felt with that distraction he might go a little too far which is only four or five inches before you can really put someone in a lot more pain.[7]

Appellant testified that he is 6 feet tall and, on January 8, 2006, he weighed between 215–220 pounds. His equipment weighed approximately 41 pounds. According to appellant, in

---

7. On cross-examination, Roush conceded that he told Malarkey that he "should have eased back on that guy...."

August 2005 he suffered an injury to his back, but he did not take medication at the time of the incident because it "made him mentally cloudy."

Malarkey recalled that Sergeant Frishkorn came to Popeye's Restaurant, where Malarkey was working as a security officer, and spoke with him. He recounted:

> [Frishkorn] told me that he had been involved with a chase with [Courtney] prior. Sergeant Collington had chased him on a prior incident and lost him. He told me that while off-duty he had kind of—like, sort of impeded his path of travel while he was trying to get gas asking for money in an aggressive manner, and also that he observed him in what he thought was a drug transaction. . . .

When Malarkey first observed Courtney, he radioed that he saw the suspect. Appellant "exited [his] patrol vehicle" and said to Courtney: "Read the side of my car. I have a dog. Don't even think about running. I've got to talk to you." Nevertheless, Courtney started to run westbound in the eastbound lane of East West Highway. Malarkey "didn't know if [Courtney] was trying to ambush [him] with what he was doing." Malarkey recalled what occurred when he arrived at the scene:

> I observed Mr. Courtney laying in what we call a prone position, laying face down, arms out to the side, legs spread, facing—his head facing this way to the right. I was approaching from the left. Officer Fields was in a crouching position straddling Mr. Courtney. And out of the corner of my eye, I saw Officer Gaskin back here in what appeared to be a contact cover position. (Indicating on photograph throughout.) . . . I ran up and I stopped. It appeared that Mr. Courtney was handcuffed.

> \* \* \*

> I looked down and I realized that Mr. Courtney was not handcuffed. . . . I immediately dropped down and assisted with handcuffing and secured the left handcuff—of the left

arm between my thighs and knees, and handcuffed his left arm to his right arm.[8]

The following testimony is also pertinent:

[APPELLANT'S COUNSEL]: When you arrived on the scene and you saw Mr. Courtney lying on the ground, initially when you thought he was cuffed and later when you saw one cuff, what did the positioning of Mr. Courtney the way Officer Fields had Mr. Courtney positioned mean to you at that moment?

[MALARKEY]: We have a high-risk felony takedown taking place ... When I come up on a scene like that, that, to me, means we are taking down a robbery suspect, someone who's produced a weapon, someone who's exhibited some sort of violence towards the Police Officers, a carjacking suspect, something of an immediate danger. You can't just take down a regular citizen that you want to identify onto the ground prone out. It's completely inappropriate. At that point in time I thought when I had lost sight of him, I thought something had transpired. All those red flags that were going up were just like, something happened, because this guy is now in a contact cover, felony high-risk takedown.

According to Malarkey, "It was a very dangerous situation. The way Officer Fields was standing was extremely unusual and dangerous, and my intention was to render that situation safe immediately." Malarkey maintained that his knee "went in [Courtney's] back," but, after about two seconds, he removed his knee. Claiming that he "didn't have full mobility in [his] back," Malarkey said: "As I was going down, I realized that my back wasn't flexing. If anyone can picture like trying

---

8. Later, appellant added: "I was full speed. I stopped. I thought he was handcuffed. I then looked—instantaneously, I looked down. His hand is not handcuffed. His hand is moving back and forth. Fields is trying to get him handcuffed." Malarkey continued: "I had a second to react, and that's what I did. I did the best thing to my training, my ability to keep Officer Fields, who is in an unsafe position, to make it a safe situation, and get Mr. Courtney handcuffed. That's all I wanted to do."

to kneel down, but not bending your back, it's kind of—you're almost leaning backwards as you are trying to keep your back straight. As I was going down, my back didn't give. I went straight down."

Malarkey recalled that Courtney complained several times that he could not breathe. Appellant stated: "I'm not in the best shape. I don't believe he was in the best shape. We were both out of breath. We were in a foot chase. I couldn't breathe either." Malarkey did not learn that Courtney was injured until January 28, 2006.

After the defense rested,[9] appellant's counsel renewed his motion for judgment, incorporating his prior arguments. Again, the court reserved. Thereafter, the State recalled Officer Gaskin and Officer Fields as rebuttal witnesses.[10] Following the State's rebuttal, defense counsel again renewed his motion for judgment of acquittal, "adopting and incorporating each and all of the arguments that had been made on each of the occasions when I have previously made this motion." He argued:

> The standard, Your Honor, at this point is different. At the end of the State's case … the standard was that the State is entitled to all reasonable inferences in their favor. That's not the standard now. The standard is a legal sufficiency standard, which is whether a reasonable jury considering this evidence could conclude beyond a reason-

---

**9.** Appellant also called several character witnesses. Their testimony is not pertinent to the issues on appeal. In addition, the defense introduced Courtney's criminal record, which consisted of numerous convictions from 1983 to 2002. These included possession of controlled substances; three felony theft convictions; two misdemeanor theft convictions; robbery; breaking and entering a storehouse; and third degree burglary of a dwelling.

**10.** Officer Gaskin explained the training she received at the Police Academy on handcuffing techniques, and stated that she did not regard as dangerous the way that Officer Fields had handcuffed Courtney. She explained that Fields "already had the situation under control." Officer Fields located on a photograph where Malarkey's cruiser was parked and where he parked his cruiser when he arrived at the scene.

able doubt that the Defendant is guilty of the offense charged in this particular case.

It's a different standard. The State is not entitled to any inferences at this stage. It is an objective reasonableness standard and whether the evidence here would permit that.

Now, as I spoke about before without repeating everything, that analysis has got to be done with the overlay that a Police Officer has a qualified or limited amount of immunity to use force under these circumstances. . . . Could a reasonable jury, under these facts, conclude that every reasonable Police Officer would have not acted in this fashion? And we have, within this evidence, clearly proved that there are reasonable Police Officers who believe that this was not excessive on both sides of the order of presentation.

. . . In this case everything that Officer Malarkey did was in the course of his duties. It was quick. It was done for a specific purpose. And it does not, we submit under these facts, permit a reasonable jury to conclude that it was excessive even if another Police Officer might have done it in a different way.

\* \* \*

It is a single event. It's over almost before it began. And it was done for the purpose of effecting what even Officer Fields acknowledged was a potentially dangerous situation such that he was justified in pulling his gun and ordering this guy down.

The court again reserved, without objection from the defense or the State. As noted, the case was submitted to the jury. Because the jury was unable to reach a unanimous verdict, the court declared a mistrial on May 23, 2007.

On July 18, 2007, appellant filed a post-trial "Motion for Judgment of Acquittal." He claimed that "the conduct of Officer Malarkey was reasonable and appropriate when reviewed through the eyes of a reasonable police officer similarly situated" and "the evidence was insufficient to support a

finding of guilt beyond a reasonable doubt that the force used by [Malarkey] was excessive."

Seven months later, on February 20, 2008, the State filed a "Response to Motion for Judgment of Acquittal," requesting that the court find that appellant's motion for judgment was "a nullity for lack of jurisdiction." [11] It explained that, pursuant to *State v. Sirbaugh*, 27 Md.App. 290, 339 A.2d 697 (1975), the decision to allow appellant's case to go to the jury "effectively denied the motions for judgment of acquittal" and that the mistrial "ended any dispute before the Court as to whether there was sufficient evidence . . . ."

Appellant responded on February 21, 2008, and also filed a "Supplemental Motion to Dismiss on the Basis of Violation of Principles of Double Jeopardy and Due Process." He asked the court to "grant his motion for judgment of acquittal, but also, in the alternative, dismiss the indictment on the grounds that any re-trial would subject the Defendant to twice being placed in jeopardy . . . ." Appellant asserted:

> Not only was the evidence insufficient to support any reasonable jury finding of guilty in this matter, but the fact that the Defendant has been placed in jeopardy, that the State presented a legally insufficient case and the fact that the State now seeks to re-prosecute the Defendant violates his constitutional and common law protection of due process and his constitutional and common law protection against twice being placed in jeopardy for the same offense.

At a hearing on February 21, 2008,[12] appellant's counsel stated: "If the Court concludes that there was legally insufficient evidence at the first trial for the Defendant to have been convicted by a reasonable jury, then the State has had its one shot." Appellant's counsel asked the court to "make a factual

---

11. The State did not suggest that appellant's motion was untimely. Nor did appellant complain about the State's delay in responding to his motion.

12. The judge commented that he received appellant's reply to the State's "Response to Motion for Judgment of Acquittal" and appellant's supplemental motion to dismiss on the morning of the hearing.

determination that the State legally did not meet its case." He also asked the court to dismiss the indictment based upon double jeopardy grounds, asserting:

> We believe ... that, because the Defendant was brought to trial in a case where there was legally insufficient evidence, that the State cannot go forward and we're asking the Court to make a ruling as to whether or not it would grant a Motion to Dismiss with respect to the double jeopardy argument.

The prosecutor insisted that double jeopardy did not apply, asserting: "The case law is clear that, when there is a mistrial, the State has every right to retry." He argued:

> This whole double jeopardy claim is just off base and it doesn't follow the law at all.
>
> All the cases cited by the Defendant are cases where there are verdicts. Every case. And that is a key distinction. There is no verdict in this case. It is a mistrial and the Court's jurisdiction ends at that point when the jury is dismissed ... No trier of fact left at that point, so the jurisdiction ends and that is what Serbaw [sic] *[State v. Sirbaugh,* 27 Md.App. 290, 339 A.2d 697 (1975)] says.

The prosecutor continued: "Your Honor reserved and *Serbaw* [sic] says that, by presenting and giving it to the jury, is an effective denial of the motion. [The court] submitted it to the trier of fact, and by making that decision, it has effectively said that the jury has evidence by which it can conclude— legally sufficient evidence by which they can conclude guilt beyond a reasonable doubt."

The court denied appellant's motion for judgment of acquittal and his motion to dismiss based on double jeopardy.[13] It reasoned:

> Frankly, I had operated under the assumption that a trial Court could, in fact, reserve on a Motion for Judgment following the presentation of the State's case and at the close of all the evidence and did that in this instance under

---

13. The ruling appears on the docket sheet.

the mistaken assumption that I had the authority to do that. And, later, as happens in this case, the jury was unable to reach a verdict and [the court] declared the mistrial.

*Serbaw* [sic] has not been reversed. I believe it is still good law ... whatever I would or could have done is now totally speculative. As the Court says, it is clear that such action was a nullity since, once [the court] had declared a mistrial and dismissed the jury, [the court] lost all authority to take action in the case.

So, having done that, I think, by operation of the law, I am without the authority to do this.

In regard to double jeopardy, the court also stated: "Well, on the double jeopardy—I don't think—if there was a mistrial, then there was no trial to verdict ... I don't think jeopardy is attached if you declared a mistrial. I appreciate the argument that says, if there is legally insufficient evidence, I should have ruled on the motion. And, trust me, I would have today had it not been for the *Serbaw* [sic] case." [14]

On February 27, 2008, appellant noted an appeal and filed a "Motion For Stay of Proceedings Pending Appellate Review of Denial of Defendant's Motion to Dismiss the Indictment on Grounds of Double Jeopardy." The circuit court granted the stay.

## DISCUSSION

### I.

Appellant contends that the State "failed to present a legally sufficient case" and "retrial of Appellant is barred by principles of double jeopardy and due process." He maintains that he "had a constitutional right to have the trial court rule on the legal sufficiency of the evidence presented by the State during the trial." By repeatedly failing to rule on his motion for judgment of acquittal, asserts appellant, the court "violated

---

14. The court quipped: "Who found the case *Serbaw* [sic]? They should give you a gold star. It's amazing."

constitutional principles of double jeopardy that prohibit affording the prosecution a second opportunity to prosecute an accused where the prosecution has failed in the initial trial to produced [sic] legally sufficient evidence."

Moreover, appellant argues: "By reserving and submitting the evidence to the jury, the judge certainly did not intend for that act to signify or rise to the level of constitutional scrutiny that the trial court was denying the motion after a finding that the evidence was sufficient." He posits:

> To permit the trial court, either by inadvertence, neglect or negligence, to deprive the Appellant of his right to a ruling that could bar further prosecution in this matter could only mean that in the context of this prosecution, that the Appellant has no constitutional double jeopardy protection against twice being put in jeopardy where the State has failed to present legally sufficient evidence.

According to appellant, his interlocutory appeal "is properly before this Court," because of the "unique factual circumstances" of this case. In his view, he was "placed in jeopardy during a week-long trial," and insists that if the court had ruled on his repeated motions for judgment of acquittal during trial, and had ruled in his favor, the prosecution would have terminated. Further, he argues: "The Appellant had a right to a ruling to protect him from twice being placed in jeopardy. The trial court cannot deprive him of that right." He adds that the "protections of double jeopardy overrule any suggestion ... that the trial court's decision to reserve can eviscerate the Appellant's right to a ruling on the sufficiency of the prosecution's evidence."

Claiming that the appeal is "premature and not allowed by law," the State has moved to dismiss. According to the State, "an appealable final judgment exists only after conviction and imposition of sentence." *See Langworthy v. State,* 284 Md. 588, 596, 399 A.2d 578 (1979) (stating that usually, for final judgment purposes, "a criminal case is complete and disposed of when a sentence has been pronounced"); *State v. Lee,* 178 Md.App. 478, 484, 943 A.2d 14 (2008) (stating that State's right

of appeal was "ripe upon final judgment, which occurred when the trial court sentenced appellee for his convictions"). In its view, "[t]he interlocutory appeal lodged by Malarkey is not specifically allowed by statute" or under the collateral order doctrine, "[n]otwithstanding that Malarkey has couched his claim in terms of double jeopardy...." The State explains:

> Resolution of the appeal in this case rests, at bottom, on a review of Malarkey's challenge to the sufficiency of the evidence presented in a trial that ended in a hung jury; therefore, it does not fall within the scope of the collateral order doctrine. To be sure, generally speaking, a criminal defendant may file an interlocutory appeal from the denial of a motion to dismiss based on double jeopardy grounds. But, as the trial court observed, Malarkey's double jeopardy claim is in essence "just a rewrapping" of his evidentiary sufficiency claim. Couching it as a double jeopardy issue "doesn't alter the fact[.]" What Malarkey terms a "double jeopardy issue" is a claim that cannot be resolved without a review of the sufficiency of the evidence.

Moreover, the State posits: "Where a mistrial is declared because a jury has been unable to reach a unanimous verdict, the[r]e is no successive prosecution, but rather a continuation of the initial prosecution...." Thus, argues the State, "[t]here is self-evidently no issue of multiple punishments for the same offense in the case at bar." It contends:

> This case should be treated no differently than cases in which the trial court denied a motion for judgment of acquittal and then declared a mistrial, without objection, because the jury was unable to reach a unanimous verdict. The case should then have proceeded to a second trial. If that trial results in a conviction and a final judgment, Malarkey can then properly challenge the sufficiency of the evidence to support the conviction on direct appeal from that judgment.

In reply, appellant asserts: "The trial court's reservation, without an express denial ... cannot be considered 'tanta-mount' to denial based upon sufficient consideration of the

evidence." By repeatedly reserving its ruling on his motion, argues appellant, the court "abrogated its responsibility to decide" his motions. Malarkey argues: "Submission to the jury under the mistaken belief that the trial court could later rule was not a proper basis for a denial of the motion [for judgment of acquittal]."

In order to determine whether the State's motion to dismiss has merit, we must explore the double jeopardy contentions in the context of the particular circumstances attendant here.

 The Double Jeopardy Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, *Benton v. Maryland*, 395 U.S. 784, 787, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), provides, in part: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb...." In a jury trial, jeopardy attaches when the jury is sworn. *Caldwell v. State*, 164 Md.App. 612, 647, 884 A.2d 199 (2005). *See Illinois v. Somerville*, 410 U.S. 458, 467, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *Taylor v. State*, 381 Md. 602, 611, 851 A.2d 551 (2004); *State v. Woodson*, 338 Md. 322, 329, 658 A.2d 272 (1995). A long line of cases makes plain that the denial of a motion to dismiss based on double jeopardy is immediately appealable under the collateral order doctrine. In *Nicholson v. State*, 157 Md.App. 304, 309, 850 A.2d 1204 (2004), we said: "Although the denial of a motion to dismiss is not ordinarily a final judgment that entitles a defendant to appeal, when the motion to dismiss is on double jeopardy grounds, defendants may appeal before trial." *See, e.g., Anderson v. State*, 385 Md. 123, 128, 867 A.2d 1040 (2005) (recognizing "the right under the collateral order doctrine to take an immediate appeal from the denial of a motion to dismiss a criminal charge on double jeopardy grounds"); *Parrott v. State*, 301 Md. 411, 418, 483 A.2d 68 (1984) (stating that the collateral order doctrine " 'permit[s] appeals from certain interlocutory decisions which conclusively determine an important question, are separate from the merits of the case, and are effectively unreviewable on appeal from a final judgment' ") (citation omitted); *Warne v. State*, 166 Md.App. 135,

139 n. 3, 887 A.2d 657 (2005) ("Denial of a motion to dismiss on double jeopardy grounds is immediately appealable under the collateral order doctrine.")

*Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), provides guidance. There, five defendants were charged in a single-count indictment with conspiracy and attempt to obstruct interstate commerce by means of extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951. *Id.* at 653, 97 S.Ct. 2034. Prior to and during trial, the defendants challenged the indictment "on grounds of duplicity of offenses, claiming that its single count improperly charged both a conspiracy and an attempt to violate the Hobbs Act." *Id.* at 654, 97 S.Ct. 2034. The federal district court required the government to establish both offenses, and instructed the jury to that effect. *Id.* The jury returned a guilty verdict against three of the defendants, who then appealed.

The United States Court of Appeals for the Third Circuit reversed the convictions and ordered a new trial "on the ground that the key tape recording had been admitted into evidence without proper authentication." *Id.* at 655, 97 S.Ct. 2034.[15] The court directed the government "to elect between the conspiracy and attempt charges on remand in order to avoid any similar problems at the next trial." *Id.* The government chose to proceed with the conspiracy charge. The defendants moved to dismiss the indictment, based on double jeopardy. After the district court denied the motion, the defendants filed an immediate appeal. The government challenged the appellate court's jurisdiction to hear the interlocutory appeal. Nevertheless, the court entertained the appeal and affirmed the district court by a "judgment order" that rejected the defendants' challenge to the indictment. *Id.* at 656, 97 S.Ct. 2034.

---

**15.** It agreed that the indictment was duplicitous, but did not discuss that argument because the defendants had been awarded a new trial on another ground.

■ The Supreme Court reversed the Third Circuit and remanded for a new trial. We quote at length from the Supreme Court's decision, *id.* at 659–63, 97 S.Ct. 2034:

Although it is true that a pretrial order denying a motion to dismiss an indictment on double jeopardy grounds lacks the finality traditionally considered indispensable to appellate review, we conclude that such orders fall within the "small class of cases" that *Cohen [v. Benefit Indus Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) ] has placed beyond the confines of the final-judgment rule. In the first place there can be no doubt that such orders constitute a complete, formal and, in the trial court, final rejection of a criminal defendant's double jeopardy claim. There are simply no further steps that can be taken in the District Court to avoid the trial the defendant maintains is barred by the Fifth Amendment's guarantee. . . .

Moreover, the very nature of a double jeopardy claim is such that it is collateral to, and separable from, the principal issue at the accused's impending criminal trial, *i.e.,* whether or not the accused is guilty of the offense charged. In arguing that the Double Jeopardy Clause of the Fifth Amendment bars his prosecution, the defendant makes no challenge whatsoever to the merits of the charge against him. Nor does he seek suppression of evidence which the Government plans to use in obtaining a conviction. *See DiBella v. United States,* [369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962) ]; . . . *Cogen v. United States,* 278 U.S. 221, 49 S.Ct. 118, 73 L.Ed. 275 (1929). Rather, he is contesting the very authority of the Government to hale him into court to face trial on the charge against him. *Menna v. New York,* 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975); *Blackledge v. Perry,* 417 U.S. 21, 30, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); *Robinson v. Neil,* 409 U.S. 505, 509, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973). The elements of that claim are completely independent of his guilt or innocence.

. . . [T]he matters embraced in the trial court's pretrial order here are truly collateral to the criminal prosecution itself in the sense that they will not "affect, or . . . be

affected by, decision of the merits of this case." *Cohen,* 337 U.S., at 546, 69 S.Ct. 1221.

\* \* \*

Our conclusion that a defendant may seek immediate appellate review of a district court's rejection of his double jeopardy claim is based on the special considerations permeating claims of that nature which justify a departure from the normal rule of finality. Quite obviously, such considerations do not extend beyond the claim of former jeopardy and encompass other claims presented to, and rejected by, the district court in passing on the accused's motion to dismiss. Rather, such claims are appealable if, and only if, they too fall within *Cohen's* collateral-order exception to the final-judgment rule. Any other rule would encourage criminal defendants to seek review of, or assert, frivolous double jeopardy claims in order to bring more serious, but otherwise nonappealable questions to the attention of the courts of appeals prior to conviction and sentence.

Nevertheless, the Supreme Court concluded that, under the facts of *Abney,* the denial of appellants' motion to dismiss was not immediately appealable. It reasoned, *id.* at 663, 97 S.Ct. 2034:

Here, we think it clear that the District Court's rejection of petitioners' challenge to the sufficiency of the indictment does not come within the *Cohen* exception. First, an order denying a motion to dismiss an indictment for failure to state an offense is plainly not "collateral" in any sense of that term; rather it goes to the very heart of the issues to be resolved at the upcoming trial. Secondly, the issue resolved adversely to petitioners is such that it may be reviewed effectively, and, if necessary, corrected if and when a final judgment results. We therefore conclude that the Court of Appeals had no jurisdiction . . . to pass on the merits of petitioners' challenge to the sufficiency of the indictment at this juncture in the proceedings.

The question, then, is whether Malarkey is entitled to immediate review of the sufficiency of the evidence.

The court below relied upon *State v. Sirbaugh*, 27 Md.App. 290, 339 A.2d 697 (1975), to conclude that its reservations amounted to a denial of appellant's motions for acquittal. On this basis, it rejected appellant's claims that the court did not resolve the challenge to the sufficiency of the evidence. Urging this Court to overrule *Sirbaugh*, appellant contends that it is constitutionally invalid as applied.

As noted, appellant argues that the court "abrogated its responsibility to decide" his motions when it reserved. He insists that the "granting of the mistrial," and the trial court's subsequent conclusion that the mistrial "deprived [the Court] of its authority to rule on Appellant's motion, placed Appellant in a no-win position." In his view, there is a "need to protect double jeopardy principles where there has been a gross violation of an accused's right to have the trial court rule on a motion challenging the legal sufficiency of the prosecution's evidence."

According to appellant, *Sirbaugh*, "decided over 30 years ago, does not undertake any analysis of the principles set forth" in "cases discussing the application of double jeopardy protections in circumstances where the State has failed to adduce legally sufficient evidence at trial." Moreover, appellant points out that Rule 4–324, governing motions for judgment of acquittal, does not specifically prohibit a trial court from reserving its ruling on such a motion.[16] "In the absence

---

16. **Rule 4–324. Motion for judgment of acquittal.**

 (a) **Generally.** A defendant may move for judgment of acquittal on one or more counts, or on one or more degrees of an offense which by law is divided into degrees, at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence. The defendant shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment of acquittal shall be necessary. A defendant does not waive the right to make the motion by introducing evidence during the presentation of the State's case.

 (b) **Action by the court.** If the court grants a motion for judgment of acquittal or determines on its own motion that a judgment of acquittal should be granted, it shall enter the judgment or direct the clerk to

of a specific prohibition against reserving its ruling," argues appellant, "any statement in *Sirbaugh* that the trial court could not reserve its ruling is simply wrong and without authority." He states:

> It is wrong to read into *Sirbaugh* an expansion and addition to [Rule 4–324] to hold that where a trial court reserves on ruling and submits evidence to the jury, the trial court is deemed to have denied the motion ... The rules as applied in Appellant's case did not afford the Appellant his constitutional right to have the Court assess the sufficiency of the State's evidence. No other vehicle was or is available to effect Appellant's constitutional protections against twice being put in jeopardy by twice being brought to trial where, in the first trial, the State has failed to adduce sufficient evidence to support a conviction.

The State counters that Malarkey's position is "fundamentally flawed; the trial court did effectively rule on the motion." It relies on *Sirbaugh* for the proposition that "the trial court's decision to reserve on the motion for judgment of acquittal and present the case to the jury was tantamount to a denial of the motion...."

Alternatively, the State contends that Malarkey "has waived any complaint that he had a constitutional right to have the trial court rule on his motion for judgment of acquittal." Noting that the trial court explicitly stated three times that it would reserve ruling on the various motions for judgment of acquittal, the State observes: "Defense counsel never raised any objection to the trial court's decision to reserve its ruling." Rather, claims the State, Malarkey "stood mute in the face of the trial court's repeated announcement that it was reserving on the motions...." Even when the case was about to be presented to the jury for deliberations, appellant did not object or request a ruling. According to the

---

enter the judgment and to note that it has been entered by direction of the court. The court shall specify each count or degree of an offense to which the judgment of acquittal applies....

State, appellant's argument "is appellate afterthought in its purest form." It posits:

> Had defense counsel stated that he had a right to a ruling on the motion at trial, before the case was submitted to the jury, the court no doubt would have ruled on the motion. Counsel did not do so, and Malarkey should not be heard to argue on appeal that the court erred or that he had a "right" to a ruling at trial.

Appellant replies that the State is "flatly wrong" in claiming that he "waived any constitutional right to have review of the motion for judgment of acquittal." In his view, the trial court reserved because of "its own serious doubt about the legal sufficiency of the prosecutor's evidence." Moreover, he avers:

> Appellant can not be deemed to have waived a constitutional right when neither he, the State, nor the court realized a constitutional right was going by the wayside. This is because both parties and the court were under the assumption the court could [reserve]. Appellant raised constitutional concerns at the first opportunity he learned that they were being put at issue.

We agree with the State's waiver claim. To be sure, the defense repeatedly moved for acquittal, and the court repeatedly reserved. But, appellant never made known to the court that he was entitled to a ruling before submission to the jury. Had he done so, the court might well have been willing to rule. A party cannot complain about the court's failure to rule on a pending motion unless it has "brought [it] to the attention of the trial court." *White v. State*, 23 Md.App. 151, 156, 326 A.2d 219 (1974), *cert. denied*, 273 Md. 723 (1975). And, as the Court of Appeals has recognized, " '[e]ven errors of Constitutional dimension may be waived by failure to interpose a timely objection at trial.' " *Taylor*, 381 Md. at 614, 851 A.2d 551 (citation omitted). *See also Robinson v. State*, 410 Md. 91, 111, 976 A.2d 1072, 1084 (2009); *Brown v. State*, 409 Md. 1, 9, 971 A.2d 932 (2009); *Ingram v. State*, 179 Md.App. 485, 505, 947 A.2d 74 (2008).

■ The cases are legion that objections or exceptions afford the trial court an opportunity to cure or correct an error. The court below was not afforded that opportunity. *See, e.g., Johnson v. State,* 310 Md. 681, 686, 531 A.2d 675 (1987) (stating that only if a party takes exception to an error in a jury instruction does the court have the opportunity to correct it); *Morris v. State,* 153 Md.App. 480, 509, 837 A.2d 248 (2003) (noting that "one of the key virtues of the preservation requirement" is that it enables the trial court "to correct an easily correctable mistake"), *cert. denied,* 380 Md. 618, 846 A.2d 402 (2004). The trial court cannot correct errors of which it is not informed. Considerations of fairness and judicial efficiency generally require that all challenges that a party wishes to make to a trial court's action or conduct "be presented in the first instance to the trial court so that (1) a proper record can be made with respect to the challenge, and (2) the other parties and the trial judge are given an opportunity to consider and respond to the challenge." *Chaney v. State,* 397 Md. 460, 468, 918 A.2d 506 (2007).

Even if appellant's claim was not waived, we are satisfied that it lacks merit. We explain.

■ We begin with a review of *Sirbaugh.* John Sirbaugh was charged with manslaughter by automobile and other motor vehicle offenses. 27 Md.App. at 291, 339 A.2d 697. The trial court reserved ruling on the defense's motion for judgment of acquittal at the close of all the evidence, and the case was submitted to the jury. Thereafter, the court declared a mistrial due to the illness of a juror. *Id.* It then granted the motion for judgment of acquittal on which it had reserved, and dismissed the indictment. *Id.* at 292, 339 A.2d 697. The State subsequently filed a one-count criminal information, again charging Sirbaugh with manslaughter by automobile. *Id.* Sirbaugh moved to dismiss based on double jeopardy. After the court granted Sirbaugh's motion, the State appealed.

On appeal, we considered whether the trial judge had "the power to grant the Appellee's Motion for a Judgment of

Acquittal after declaring a mistrial, where the trial judge had [previously] taken the Motion under advisement." *Id.* at 293, 339 A.2d 697. The Court said, *id.* at 294, 339 A.2d 697:

[I]n a criminal jury case, the trial judge has two options: (1) grant a motion for judgment of acquittal, or (2) deny the motion and submit the case to the jury. *He has no authority to reserve his ruling on the motion for judgment of acquittal and at the same time submit the case to the jury. If he follows such a course, it is tantamount to denying the motion.*

We think, however, the simple answer to the factual situation presented in this appeal is found in the action of the trial judge *in declaring a mistrial and then endeavoring to make a ruling on the motion for judgment of acquittal, which ruling he had previously purported to reserve. It is clear that such action was a nullity since once he had declared a mistrial and dismissed the jury, he lost all authority to take any action in the case.* The declaration of the mistrial and the dismissal of the jury ended the trial and ended the judge's participation therein. Thus, *his purported ruling on the motion was completely ineffectual and meaningless.*

With the concession of [Sirbaugh] that the trial judge acted properly in granting the mistrial it, thus, effectively dissipated the jeopardy to which appellee had been subjected. We have no alternative than to find that it was error to grant the appellee's motion to dismiss the second criminal information on the ground that the trial thereon would place appellee twice in jeopardy thereby violating his Fifth Amendment right under the federal constitution. (Emphasis added) (Citations omitted).

In reaching its decision, the *Sirbaugh* Court considered Maryland Rule 563(a)(2), the predecessor to Rule 2–532(b). Applicable to civil cases, Rule 563(a)(2) stated, in part: "Where the court reserves decision on a motion for a directed verdict, and submits the case to the jury, that action by the court operates as a motion for judgment [N.O.V.] under this

Rule." [17] But, the Court recognized that Rule 563 "does not apply to criminal cases." [18] *Id.* at 296, 339 A.2d 697. *See also Hudson v. State,* 16 Md.App. 49, 69 n. 3, 294 A.2d 109 ("We are not aware of a statute, rule or judicial opinion in this jurisdiction providing for a judgment N.O.V. in a criminal cause."), *cert. denied,* 266 Md. 737 (1972); *Williams v. State,* 4 Md.App. 558, 561, 244 A.2d 476 ("[W]e find no basis in the Maryland Rules for a motion for judgment N.O.V. in a criminal case tried before a jury."), *cert. denied,* 252 Md. 733 (1969).

■ As the Court stated in *Knox v. State,* 404 Md. 76, 85, 945 A.2d 638 (2008), "When we interpret the Rules of Proce-

---

**17.** Rule 2–532(b) currently states, in part: "If the court reserves ruling on a motion for judgment made at the close of all the evidence, that motion becomes a motion for judgment notwithstanding the verdict if the verdict is against the moving party or if no verdict is returned."

**18.** Federal Rule of Criminal Procedure ("F.R.Crim.P.") 29 expressly allows a court to reserve ruling. It states, in part:

**Rule 29. Motion for a Judgment of Acquittal.**

\*　　\*　　\*

(b) **Reserving Decision.** The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

(c) **After Jury Verdict or Discharge.**

(1) *Time for a Motion.* A defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later.

(2) *Ruling on the Motion.* If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal. . . .

*See United States v. Borrone–Iglar,* 468 F.2d 419, 422 (2nd Cir.1972) ("As to the motions made at the close of all the evidence and after verdict, the judge was plainly entitled to reserve decision under Fed. R.Crim.P. 29(b) and (c)"), *cert. denied,* 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973); *United States v. Fincke,* 437 F.2d 856, 860 (2nd Cir.1971) (F.R.Crim. P. 29(b) "is susceptible of the meaning that, in the event that the case is submitted to the jury, the trial judge may decide the motion at any time before or after the jury returns a verdict or after the jury has been discharged for failure to agree upon a verdict.")

dure, we use the same canons and principles we use to construe statutes." *See Hoile v. State*, 404 Md. 591, 608, 948 A.2d 30 (2008) (stating that " '[t]o interpret rules of procedure, we use the same canons and principles of construction used to interpret statutes' ") (citation omitted); *Blundon v. Taylor*, 364 Md. 1, 7, 770 A.2d 658 (2001) (stating that " 'the canons of statutory construction ... are also generally applicable in respect to rule construction' ") (quoting *Jones v. Hubbard*, 356 Md. 513, 526, 740 A.2d 1004 (1999)); *State v. Wiegmann*, 350 Md. 585, 592, 714 A.2d 841 (1998) (recognizing that the standards of construction for statutes also apply to the interpretation of rules of procedure); *State v. Harrell*, 348 Md. 69, 79, 702 A.2d 723 (1997) ("In construing a rule, we apply principles of interpretation similar to those used to construe a statute."); *Brown v. Daniel Realty Co.*, 180 Md.App. 102, 115, 949 A.2d 6 (2008) ("When the courts are called upon to interpret judicial rules of procedure, the canons of statutory construction are generally applicable.") Therefore, the principles of statutory construction provide guidance.

■ By its terms, Md. Rule 4–324 does not authorize a court to reserve its ruling on a motion for judgment of acquittal, in contrast to the civil context. *See* Rule 2–5 32. The Court of Appeals and the General Assembly are obviously aware of F.R.Crim. P. 29. Neither has seen fit to conform Rule 4–324 to F.R.Crim. P. 29. It is not our province to do so. As the Court of Appeals stated in *Simpson v. Moore*, 323 Md. 215, 226, 592 A.2d 1090 (1991), a court " 'is not at liberty to add to the language of the law; and the court must hold that the Legislature intended to omit the provision however improbable that may appear. ...' " (citation omitted). *See also Nelson v. State*, 187 Md.App. 1, 13, 975 A.2d 298 (2009) (" 'We may not read language into a statute that is not there, even if we are not satisfied with the outcome of the case.' ") (quoting *Johnson v. Mayor & City Council*, 387 Md. 1, 14, 874 A.2d 439 (2005)); *Graves v. State*, 364 Md. 329, 351, 772 A.2d 1225 (2001) (stating "we have held that this Court 'could not invade the function of the legislature' by reading missing language into a statute") (citation omitted).

We also find it helpful to consider what occurs when a trial court failed, in a non-jury criminal trial, to render a verdict with respect to all counts. "[S]uch inaction operates and is equivalent to an acquittal." *Gibson v. State,* 8 Md.App. 1, 4, 256 A.2d 890 (1969), *cert. denied sub nom., Garner v. Garner,* 257 Md. 723, 264 A.2d 858 (1970); see *also Harrington v. State,* 17 Md.App. 157, 159, 300 A.2d 405 (1973) (observing that, "[o]f course, the failure to find a verdict in respect to [a particular charge] is equivalent to a verdict of not guilty on that particular charge."); *Williams v. State,* 9 Md.App. 447, 448–49 n. 1, 265 A.2d 266 (1970) (noting that "the express finding of guilty under the first count of [an indictment] and the silence as to the remaining counts had the effect of a verdict of not guilty as to the [remaining counts].") Here, the trial court affirmatively chose to submit the case to the jury.

In addition, the principles of *stare decisis* lead us to conclude that the trial court's decision to reserve ruling on the motions for judgment of acquittal amounted to a denial of those motions. We elaborate.

"*Stare decisis,* which means to stand by the thing decided, 'is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.' " *Livesay v. Baltimore County,* 384 Md. 1, 14, 862 A.2d 33 (2004) (quoting *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)); *State v. Adams,* 406 Md. 240, 259, 958 A.2d 295 (2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 1624, 173 L.Ed.2d 1005 (2009). Its purpose is " 'to insure that people are guided in their personal and business dealings by prior court decisions, through the established and fixed principles they announce. . . .' " *Corby v. McCarthy,* 154 Md.App. 446, 480, 840 A.2d 188 (2003) (quoting *Plein v. Dep't of Labor, Licensing and Regulation,* 369 Md. 421, 435, 800 A.2d 757 (2002)); *see also Thompson v. State,* 393 Md. 291, 306, 901 A.2d 208 (2006) (" 'We are cognizant of the importance of stare decisis and the resulting certainty, definition,

and dependability it gives the law.'") (citation omitted). In *Livesay*, the Court said, 384 Md. at 14–15, 862 A.2d 33:

> The United States Supreme Court has noted that "by the important doctrine of *stare decisis* . . . we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Vasquez v. Hillery*, 474 U.S. 254, 265, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986). That Court also explained that *stare decisis* "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact." *Id.* at 265–66, 106 S.Ct. at 624. While a court has the judicial power to overrule prior cases, courts generally act in a constrained manner to create predictability, "stability and integrity in the law." *McMellon v. United States*, 387 F.3d 329, 355 (4th Cir.2004).

 To be sure, the doctrine of *stare decisis* does not "preclude us from changing or modifying a common law rule when conditions have changed or that rule has become so unsound that it is no longer suitable to the people of this State. . . ." *Livesay*, 384 Md. at 15, 862 A.2d 33; *see also Adams*, 406 Md. at 259, 958 A.2d 295 (stating that the "inertial and institutional devotion to stare decisis is not absolute . . . for we will strike down a decision that is 'clearly wrong and contrary to established principles'") (citation omitted). But, "departure from the rule should be the extraordinary case, especially so when the change will have a harmful effect upon society." *Id. See Bozman v. Bozman*, 376 Md. 461, 493, 830 A.2d 450 (2003).

We are unpersuaded that *Sirbaugh* was wrongly decided. In our view, the reservation of a ruling on a motion for judgment of acquittal was tantamount to a denial of the motions for acquittal when the court submitted the case to the jury.

Next, we must determine whether the declaration of a mistrial implicated double jeopardy, so as to bar a retrial. We hold that it did not.

Ordinarily, a defendant "may not claim the benefit of the [double jeopardy] clause unless there has been a trial that has proceeded to a verdict...." *Nicholson, supra,* 157 Md.App. at 310, 850 A.2d 1204; *see Kyle v. State,* 6 Md.App. 159, 161, 250 A.2d 314 (1969) (stating "no man is in jeopardy until verdict is rendered"). There are exceptions to this rule, however. When, as here, a case ends in a mistrial, "the constitutional prohibition against double jeopardy permit[s] a retrial ... only if there was 'manifest necessity' for the mistrial...." *Jourdan v. State,* 275 Md. 495, 510, 341 A.2d 388 (1975); *see Woodson, supra,* 338 Md. at 329, 658 A.2d 272 ("Thus, after jeopardy attaches, retrial is barred if a mistrial is declared without the defendant's consent unless there is a showing of 'manifest necessity' to declare the mistrial."); *Caldwell, supra,* 164 Md.App. at 647, 884 A.2d 199 ("In the mistrial/retrial variety of double jeopardy protection, when a mistrial is granted at the request of the State, or is granted by the court *sua sponte,* ..., retrial is barred unless there was 'manifest necessity' for the mistrial."); *Fields v. State,* 96 Md.App. 722, 733, 626 A.2d 1037 (1993) (stating "no retrial will be permitted unless there was a 'manifest necessity' for the mistrial"). As the *Caldwell* Court recognized, 164 Md.App. at 647, 884 A.2d 199: "This variety of double jeopardy protection preserves the defendant's 'valued right to have his trial completed by a particular tribunal.'" (quoting *In re Mark R.,* 294 Md. 244, 249, 449 A.2d 393 (1982)).

In *Oregon v. Kennedy,* 456 U.S. 667, 672, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the Supreme Court recognized that a deadlocked jury is the "prototypical example" of manifest necessity, so as to permit a retrial after the declaration of a mistrial. *See also Arizona v. Washington,* 434 U.S. 497, 509, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). Indeed, in *Yeager v. United States,* —— U.S. ——, 129 S.Ct. 2360, 174 L.Ed.2d 78 (2009), the Court reiterated that "a jury's inability to reach a

decision is the kind of 'manifest necessity' that permits the declaration of a mistrial and the continuation of the initial jeopardy that commenced when the jury was first impaneled." *Id.* at 2366. This is because "jeopardy is not regarded as having come to an end so as to bar a second trial in those cases where 'unforseeable circumstances . . . arise during [the first] trial making its completion impossible, such as the failure of a jury to agree on a verdict.'" *Green v. United States,* 355 U.S. 184, 188, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957) (quoting *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949)); *see also State v. Crutchfield,* 318 Md. 200, 209, 567 A.2d 449 (1989) (stating that a hung jury is "considered to be the classic example of what constitutes manifest necessity for a mistrial"); *Wooten–Bey v. State,* 308 Md. 534, 542–43, 520 A.2d 1090 (1987) ("It is perfectly obvious that there is generally a 'manifest necessity' for the judge to declare a mistrial when the jury is unable to reach a verdict in a criminal cause, so that ordinarily a retrial is permitted.").

■■■ *Richardson v. United States,* 468 U.S. 317, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984), provides guidance. Richardson was tried on three counts of narcotics violations. The jury was deadlocked on two counts and the court declared a mistrial as to them. Richardson moved to bar his retrial, alleging that the evidence at the first trial was insufficient to convict, and that the lower court improperly denied his motion for judgment of acquittal. The Supreme Court held that, "[r]egardless of the sufficiency of the evidence at the first trial," double jeopardy did not bar a retrial. *Id.* at 326, 104 S.Ct. 3081. It reasoned, *id.:*

> [W]e reaffirm the proposition that a trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected. The Government, like the defendant, is entitled to resolution of the case by verdict from the jury, and jeopardy does not terminate when the jury is discharged because it is unable to agree.

Here, when the jury was unable to reach a verdict, the court declared a mistrial. Under these facts, re-trial is not prohibited by the Double Jeopardy Clause. It follows that Malarkey's appeal is premature. Therefore, we shall grant the State's motion to dismiss the appeal.[19]

**APPEAL DISMISSED. COSTS TO BE PAID BY APPELLANT.**

---

**19.** In view of our disposition, we need not address the legal sufficiency to support the assault conviction. Nevertheless, based on the facts set forth in our factual summary, we are readily satisfied that the evidence was sufficient to sustain the conviction for second-degree assault under C.L. § 3–203.